**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| JD ("John") Floyd<br>　　　　　　Plaintiff, | Civil Action No. |
| 　　　vs. | |
| Detective John Dillmann; Detective Michael Rice;<br>Lieutenant Stephen London; The City of New<br>Orleans; Leon Cannizzaro, Jr., *in his official<br>capacity*; and John Doe Defendants | |
| 　　　　　　Defendants. | |

The Plaintiff JD ("John") Floyd, by and through his attorneys, Neufeld Scheck & Brustin,

LLP, Lathrop Gage LLP, and the Law Offices of John N. Adcock, allege as follows:

## INTRODUCTION

1.　　　John Floyd spent over thirty-six years wrongfully imprisoned for the 1980 murder

of William Hines—a crime he did not commit.

2.　　　Both Hines and another man, Rodney Robinson, were murdered by the same, as-

yet unidentified assailant in strikingly similar attacks days apart in the French Quarter over

Thanksgiving week in 1980. Hines and Robinson were both gay; each appears to have invited the

perpetrator in for a drink and a sexual encounter before the interaction turned violent. Both men

were found naked and repeatedly stabbed to death. There were no signs of forced entry at either

scene.

3.　　　New Orleans Police Department ("NOPD") Detectives investigating the murders

quickly realized that they were committed by the same perpetrator. Based on the description of a

suspect seen fleeing from the Robinson murder and hair and blood evidence found at the scenes,

they knew this perpetrator was a black male; forensic testing later demonstrated he had Type-A

blood. Nevertheless, after other investigative efforts failed and under mounting pressure to solve these high-profile cases, NOPD Detectives built a false case against Mr. Floyd—a white male with Type-B blood—for both murders. Mr. Floyd was an easy target: an indigent drifter with comprehension skills comparable to an eight-year-old, he was known around the French Quarter as an alcoholic and drug user who often frequented gay bars.

4.      No eyewitness ever connected the innocent Mr. Floyd to either victim or murder. Not only did no physical or forensic evidence implicate him, but evidence in the NOPD's possession *excluded* him as the perpetrator. The only "evidence" ever implicating Mr. Floyd was a result of Defendants' unconstitutional misconduct: NOPD Homicide Detectives John Dillmann and Michael Rice along with NOPD Officer John Reilly fabricated nearly identical confessions to each murder and then physically assaulted, threatened, and coerced Mr. Floyd into signing them. NOPD Detectives also coerced two other witnesses into falsely claiming Mr. Floyd had made admissions to them to corroborate the coerced confessions.

5.      Despite Defendants' misconduct, the prosecution case against Mr. Floyd remained weak. But the NOPD had additional evidence exculpating Mr. Floyd which it never disclosed. In 1981, before Mr. Floyd's trial, NOPD analysts reviewed latent prints from locations at both the Hines and Robinson crime scenes that the perpetrator was believed to have touched: the half-drunk bottle of whiskey on Hines's kitchen table, the abandoned drinking glasses left on bedside tables in Robinson's room, and the passenger-side of Robinson's car. The NOPD analysis established that a number of these prints were left by an individual other than the victims or an innocent source, and that those prints were *not* left by Mr. Floyd.

6.      In other words, the fingerprint evidence was powerful exculpatory evidence—it strongly suggested the perpetrator was not Mr. Floyd. But consistent with the custom, policy, and

practice of the NOPD Crime Lab and Latent Print Unit, no written report was created of these exculpatory exclusions and these exculpatory results were never given to the prosecutors, court, or Mr. Floyd and his attorneys.

7.      Mr. Floyd was tried jointly for both murders at a bench trial in January 1982. The State's case against him was essentially the same for both crimes: nearly identical confessions to each crime—which NOPD Detectives Dillmann and Rice and NOPD Officer Reilly all claimed Mr. Floyd had offered voluntarily—and three vague, uncorroborated statements allegedly made by Mr. Floyd after he had been drinking.

8.      At trial, the defense presented the limited forensic evidence the NOPD made available, all of which exculpated Mr. Floyd – to demonstrate the unreliability of the alleged confessions. Mr. Floyd was excluded as the source of the semen, blood, and hair at the Robinson scene, all of which matched an African-American man other than Robinson with Type-A blood; Mr. Floyd is white and has Type-B blood. Similar forensic evidence was not available from the Hines scene due to the delay in discovery of his body. But pubic hairs recovered from Hines's sheets came from an African-American donor—excluding Hines and Mr. Floyd as the source because the two were white with gray and blonde hair respectively.

9.      On January 6, 1982, despite the nearly identical confessions offered against him in each murder and clear evidence the crimes were committed by the same perpetrator, Mr. Floyd was convicted of the murder of William Hines but acquitted of the murder of Rodney Robinson. In other words, the exculpatory forensic evidence from the Robinson scene persuaded the court that Floyd's alleged confession to the Robinson murder was not reliable evidence. At the time, neither the court, prosecution, or defense knew about the exculpatory fingerprint

evidence from *both* scenes because NOPD had suppressed these findings. Mr. Floyd received a mandatory sentence of life without the possibility of parole.

10.    Mr. Floyd ceaselessly sought help to prove his innocence over the following two decades. As an indigent and intellectually disabled prisoner, he was unable to investigate or litigate his case himself from inside prison. But he nevertheless sent hundreds of letters seeking help. After learning of the Innocence Project New Orleans ("IPNO")—which was founded in 2001—Mr. Floyd sent hundreds of letters to IPNO begging for help before the organization was able to take his case in 2004.

11.    In 2007, IPNO had mitochondrial DNA testing conducted on all the hairs recovered from the Robinson murder scene; this testing conclusively excluded Mr. Floyd as the source of any hairs. The hairs were consistent with having come from one of two individual profiles, both of whom were of African or African-American descent—in other words, Mr. Robinson and the true perpetrator. By that time (and even prior to Hurricane Katrina), the pubic hair samples and fingernail scrapings from the Hines crime scene could not be located, such that they were unavailable for DNA testing despite IPNO's repeated requests.

12.    In September 2008, IPNO uncovered copies of the NOPD Latent Print Unit's logbook that revealed the exculpatory fingerprint results withheld by the NOPD for nearly three decades. Subsequent examination by the NOPD Latent Prints Unit confirmed that Floyd was excluded as the source of any prints from either scene. In 2008, IPNO also learned that John Rue Clegg—a close friend of Hines and the last person to see him alive—told Dillmann during the investigation that Hines had a "taste" for black men, as he had only seen Hines with black male partners. This statement was evidence that Floyd (a white man) was not the man who Hines invited back to his home on the night of the murder. Not only did Dillmann hide this exculpatory

information, but he also fabricated evidence, falsely reporting that Clegg had told him Hines frequently had sexual relations with *both* black and white male partners.

13.     Based on this new and compelling evidence of innocence, on September 14, 2016, the federal district court issued an opinion exhaustively analyzing Mr. Floyd's actual-innocence claims and finding he satisfied the extremely high *Schlup* miscarriage-of-justice standard which requires a showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent.". On May 8, 2017, the district court granted Mr. Floyd's petition for a writ of habeas corpus based on constitutional violations; namely, the State's withholding of favorable, material evidence—the exculpatory fingerprint results and statement by Clegg—in violation of *Brady*. However, the order was suspended while the State appealed. The Fifth Circuit affirmed the district court's ruling on April 6, 2018. That decision was superseded two months later, on June 25, 2018, when the Court issued a new decision denying the State's motion for rehearing *en banc*. In that decision, the Fifth Circuit affirmed the district court's rulings on both grounds: that Mr. Floyd's evidence of actual innocence provided a gateway to consider his habeas petition, and that he was entitled to relief on the merits based on his *Brady* claims. The mandate issued on July 17, 2018, but the State sought *certiorari* from the United States Supreme Court, preventing the judgment invalidating the conviction from going into effect. The habeas decision invalidating Mr. Floyd's conviction ultimately became final when the Supreme Court denied *certiorari* on November 19, 2018; and all charges against Mr. Floyd were dismissed the following day on November 20, 2018.

14.     Mr. Floyd was only incarcerated because individual Defendants fabricated evidence—including fabricating two false confessions and using physical coercion and threats to

force Mr. Floyd to sign them; withheld critical exculpatory and impeachment evidence; and conspired to prosecute him without probable cause.

15.     Unfortunately, Mr. Floyd was not the only person whose case was impacted by the NOPD's unconstitutional suppression of exculpatory fingerprint results. Indeed, the suppression of critical, exculpatory fingerprint evidence in Mr. Floyd's case was a direct result of the NOPD's custom, policy, and practice—in place both before and after 1981—of its Latent Print Unit analysts generating written reports which were sent to the prosecution and defense only when a suspect's fingerprints "matched" with the print or prints against which they were run. Whenever a suspect's fingerprints did not "match" with the print or prints against which they were run—in other words, when the results of the comparison were exculpatory—no written report would be created. As a result of this NOPD custom, policy and practice, exculpatory fingerprint results were not relayed to the prosecution or the defense, in violation of the NOPD's obligations under *Brady v. Maryland* and its progeny.

16.     Nor was Mr. Floyd the only individual who suffered as a result of extreme unconstitutional misconduct by NOPD officers—including Dillmann and Reilly—committed in the course of their investigations. For example, in 1987, the Louisiana Supreme Court published an opinion suppressing a 1978 confession obtained by Dillmann and two other NOPD detectives in light of compelling evidence establishing the suspect had been beaten. *State v. Seward*, 509 So. 2d 413 (La. 1987). Four years later, the Court reversed another conviction—for a 1979 murder—based on Dillmann's suppression of exculpatory evidence impeaching the identification of the defendant and pointing to another person's guilt. *State v. Knapper*, 579 So. 2d 956 (La. 1991). And a few years later, the Supreme Court reversed a capital murder conviction arising out

an investigation conducted by Dillmann based on exculpatory evidence he never turned over to the prosecutors. *Kyles v. Whitley*, 514 U.S. 419 (1995).

17.     In 1985, Officer Reilly was indicted for extortion for threatening to beat and shoot an FBI informant if he did not share a cash reward for helping to solve a bank robbery. During the trial, the prosecution played tapes in which Reilly threatened to make the informant "look like a piece of Swiss cheese" if he kept the money. Reilly and other witnesses testified that Reilly often made such physical threats as "jokes." Reilly was acquitted on the charges and promptly reinstated to the NOPD.

18.     Nor were Dillmann and Reilly alone in their notorious misconduct; these unconstitutional techniques were rampant in the NOPD by 1980. The individual Defendants' actions in Mr. Floyd's case were the direct result of the conduct of NOPD police supervisors and policymakers, who prioritized clearing cases with arrests and convictions over all else and condoned and facilitated the use of these unconstitutional techniques to help clear cases. Indeed, the individual Defendants' actions were the foreseeable result of a pervasive, documented pattern within the NOPD in the early 1980s and before of condoning serious investigative misconduct by failing to supervise, discipline, or train officers—like Dillmann—who openly engaged in such misconduct without fear of repercussions, as there were none.

19.     Complementing these systemic failures by the NOPD was the custom, policy and practice of the DA's Office at the time to deliberately avoid seeking any exculpatory evidence that was not affirmatively provided to them. As a result of this custom, policy, and practice, the prosecutors in Floyd's case never learned of the exculpatory fingerprint results or exculpatory witness statements like that from Clegg, and so never disclosed this evidence to the defense or the court.

20.     As a direct result of Defendants' misconduct, Mr. Floyd endured over three decades of hard labor in prison and suffered injuries and damages, including: pain and suffering, severe mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restrictions on all forms of person freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression. These injuries began in 1981 and continue to date.

## JURISDICTION

21.     Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

22.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiff's federal constitutional and civil rights.

23.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

24.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Eastern District of Louisiana, the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

25.     Plaintiff JD ("John") Floyd is a resident of the State of Louisiana. He currently resides in Lafayette, Louisiana. Mr. Floyd was wrongfully incarcerated by the State of Louisiana from his arrest in 1981 until he was exonerated in 2018.

26.     Defendant John Dillmann was at all times relevant herein a duly appointed and acting detective of the NOPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of New Orleans and the State of Louisiana. He is sued in his individual capacity.

27.     Defendant Michael Rice was at all times relevant herein a duly appointed and acting detective of the NOPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of New Orleans and the State of Louisiana. He is sued in his individual capacity.

28.     Defendant Stephen London was at all times relevant herein a duly appointed and acting Lieutenant of the NOPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of New Orleans and the State of Louisiana. He is sued in his individual capacity.

29.     Defendant John and Jane Doe Latent Print Unit analyst(s) and NOPD Supervisors are officers and/or supervisors with names yet unknown who were appointed and acting officers and/or supervisors of the NOPD, acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of New Orleans and the State of Louisiana. They are sued in their individual capacities.

30.     Defendant City of the New Orleans is a political subdivision of the State of Louisiana and a municipal corporation, which was at all relevant times the employer of individual Defendant NOPD officers. The City of New Orleans is and was at all times relevant to this complaint responsible for the polices, practices, and customs of the NOPD.

31.     Defendant Leon Cannizzaro, Jr., is the current Orleans Parish District Attorney. He is sued in his official capacity, only, as the representative of the Orleans Parish District Attorney's Office.

## FACTS

### The Crimes and Initial Investigation

32.     During the week of Thanksgiving in 1980, William Hines, Jr., and Rodney Robinson were brutally murdered within a mile of each other in the French Quarter by the same African-American assailant with Type-A blood.

33.     During the early hours of Tuesday, November 25, 1980, Hines was murdered by this yet-unknown assailant after a sexual encounter in his apartment at 629 Governor Nicholls Street. At the time of his death, Hines was a 57-year-old Caucasian gay man working as a copyeditor for the *Times-Picayune*.

34.     NOPD Officers found Hines's naked body in the bedroom of his home at approximately 1:25pm on Wednesday, November 26, 1980. Hines had been brutally stabbed to death, with large quantities of blood covering the pillows, sheets, and walls. His cause of death was determined to be multiple stab wounds of the head and chest.

35.     NOPD Detective John Dillmann was assigned as lead detective for the Hines investigation. Along with his partner, Fred Dantagnan, Dillmann conducted the scene investigation and initial interviews. At the scene, Thomas Bloodworth—Hines's close personal friend for the past twenty years—told officers that Hines was gay, frequented several gay bars in the French Quarter, and would often attempt to pick up sexual partners while intoxicated.

36.     Based on their assessment of the crime scene, Dillmann and his fellow officers quickly surmised Hines was murdered by a welcome sexual partner: there were no signs of forced entry either at the courtyard gate or the apartment door; Hines had undressed and neatly

folded his clothing on a chair next to the bed; two highball glasses containing whiskey were also found, indicating that Hines had shared a drink with his killer; and Hines was stabbed while naked in bed, as evidenced by the blood saturation on the sheets.

37.     An NOPD crime scene technician collected a large amount of physical and forensic evidence from the scene, including blood specimens from around the room, multiple hairs from the bed, and dozens of fingerprints from all over the house. Oral and anal swabs of the victim were also taken but, because of the delay in discovery of the body, the presence of seminal fluid and spermatozoa was no longer detectable. But the blood at the scene was all from a person with Type-A blood, and the hair samples collected from Hines's sheets were analyzed and determined to be pubic hairs from an African-American male.

38.      Less than three days later, in the early morning hours of Friday, November 28, 1980, Robinson was murdered at the nearby Fairmont Roosevelt Hotel in the French Quarter, also after a sexual encounter. At the time of his death, Robinson was a 25-year-old African-American gay man working for Hilton Hotel in Houston, Texas. Robinson had been in town to visit his family for Thanksgiving.

39.     NOPD Officers located Robinson's naked body in the tenth-floor hallway of the Fairmont Hotel at approximately 5:00 a.m. on November 28, 1980. Officers also found a blood smear along the wall leading back to Robinson's unlocked hotel room, and a knit skullcap stained with blood in the same hallway—laying past Robinson's body in the direction of the service elevator. Robinson's cause of death was determined to be multiple stab wounds to his neck, shoulders, and chest.

40.     NOPD Detective Michael Rice was assigned as lead detective for the Robinson investigation. He worked the initial scene with Detective Martin Venezia, who oversaw the

collection of physical and forensic evidence. Within hours of responding to the scene, Rice

learned that a hotel security guard had seen a black male running from the hotel's rear door

shortly after the time of the murder. Rice also quickly learned that Robinson was gay, and that he

had been out with a friend—David Hennessey—drinking at bars in the French Quarter until

approximately 3:15 a.m., when he dropped Hennessey off at his home in Lakeview.

41.     As with Hines, Rice and the other investigating officers believed Robinson had

brought a welcome sexual partner back to his room for a drink: the locks on his hotel room door

were functional and there was no sign of forced entry; two glasses containing bourbon were on

each end table next to the hotel bed; articles of clothing were found lying around the room; a

white tissue stained with seminal fluid was on the floor next to the bed; and the blood stains on

the bed indicated that Robinson was initially attacked while naked in bed.

42.     NOPD crime scene technicians collected a large amount of physical and forensic

evidence from the scene including: hair samples from Robinson's bed and the skullcap found in

the hallway, blood specimens from the bed, the semen-stained tissue found next to the bed, and

fingerprints from all over the room and the passenger side of Robinson's car. Hair belonging to

an African American—but not Robinson—was found on the skullcap, which was stained with

Type-O blood—Robinson's blood type.

**Detectives quickly realize that the same perpetrator committed both murders.**

43.     Though Dillmann was assigned as lead detective for the Hines murder, and Rice

as lead detective for the Robinson murder, it quickly became apparent to Dillmann and the

NOPD that the same assailant committed both murders.

44.     Both murders happened within days of each other over Thanksgiving week, less

than a mile from each other in the French Quarter, in the early hours of the morning. Both

victims were gay men who had engaged in consensual sexual activity with the perpetrator prior

to the attacks: Hines and Robinson were both found naked after having been stabbed in bed, with two half-drunk whiskey glasses found at each scene.

45.     Dillmann described the crimes' striking similarities in his supplemental report in the Hines case: "[T]he victim, Rodney Roberson [sic], was also homosexual and was killed much in the same manner as William Hines Jr. Both victims were stabbed numerous times in the upper torso and head and both victims were nude at the time of their deaths. Additionally, both murder scenes were spattered with blood. Both victims were apparently stabbed while in bed and both victims suffered stab wounds to the neck."

46.     Dillmann has since reiterated his belief that the two victims were murdered by the same perpetrator. As he explained in a 1998 documentary interview: "As soon as I walked into [the Robinson] crime scene I knew again from intuition and working these cases year in and year out . . . that [this was] the same perpetrator. The [M.O.] was just there, no forced entry #1, a blood bath, blood everywhere, the same type of defensive wounds that Bill Hines had, the blood splattered all over the wall, all over the carpeting, nothing stolen from the room . . . and glasses with alcohol beverages in them, same exact [M.O.]."

**All evidence indicates that the single perpetrator was a black man.**

47.     Evidence gathered during the initial investigations demonstrated not only that these murders were committed by a single perpetrator, but that the single perpetrator was a black man with Type-A blood.

48.     Pubic hairs recovered from Hines's sheets were determined to have come from an African-American source. Hines was white.

49.     A few days after the Hines murder, on Sunday, November 30, 1980, Dillmann located John Rue Clegg—Hines's close friend and the last person to see him alive. Clegg informed Dillmann that Hines's "taste" was for black men, as he knew this to be true from his

13

conversations with and observations of Hines. Dillmann would later hide and misrepresent this exculpatory information.

50.    Hairs recovered from the blood-stained cap found near Robinson's body were determined to be from an African-American man other than Robinson. Pubic hairs found in Robinson's hotel room were also determined to have come from an African-American man other than Robinson.

51.    On November 30, 1980—the same day Dillmann interviewed Clegg—Rice interviewed Gladys McKinney, the security guard at the Fairmont Roosevelt Hotel who witnessed a black man running from the service elevator immediately after Robinson was murdered. McKinney reported that the black man was not wearing a hat, was looking behind him as he ran, kept his right hand in his jacket pocket, and was running so fast he slammed into the guard booth.

52.    A few days later, Rice returned to the Fairmont Roosevelt Hotel to trace the route from Robinson's hotel room, to the location of his body, to where the blood-stained cap had been found, to the service elevator, to the rear door from which McKinney had seen the perpetrator flee. As reflected in his report, after conducting this follow-up investigation, Rice believed McKinney had "witnessed the perpetrator of the Robinson murder making good his escape."

53.    Consistent with all of the forensic and eyewitness evidence, NOPD Detectives Dillmann and Rice initially pursued black male suspects for the murders. One such suspect was O.W. Carter. As evidenced by the Latent Print Unit analyst's notes—which were suppressed at the time of Mr. Floyd's trial and for decades after—Carter's prints were compared to those from Robinson's room and car. Carter's prints would not have been run unless that was requested by the detective on the case—Rice and/or Dillmann. According to the analyst's notes, Carter was

excluded as the source of those prints. That information would then have been reported back to the requesting detective—which appears to have been enough to clear Carter as a suspect for both murders. (By comparison, when Mr. Floyd was similarly excluded as a source of these prints, he was nevertheless prosecuted for both murders and the exculpatory print exclusion suppressed.)

54.      In 1989, Dillmann published a book entitled *Blood Warning: The True Story of the New Orleans Slasher*, which described his view of the Hines and Robinson investigations.  In that book, Dillmann described a black man named "Tyrone Cole" as his initial "prime suspect" for the murders, who "cleared" himself by refusing to confess during interrogation. Because Dillmann unlawfully removed both case files from the NOPD to write his book, and later reported that those files were destroyed when his home was hit by Hurricane Katrina in 2005, any NOPD reports relating to Tyrone Cole are no longer available.

55.      Neither Dillmann nor Rice included exculpatory information regarding their initial investigation into O.W. Carter, Tyrone Cole, or any other black male suspects in the supplemental reports they transmitted to the District Attorney's Office (which were prepared and finalized *after* Mr. Floyd was arrested).

56.      With none of their initial leads panning out, NOPD Detectives were under increasing pressure to solve these murders quickly.

**With no new leads and under mounting pressure to solve the crimes, Defendants begin to create a case against the vulnerable Mr. Floyd.**

57.      Both cases were very high-profile: Hines had been a copy editor at the *Times-Picayune* for almost twenty years, and Robinson was a successful young business man murdered in the elite Fairmont Roosevelt Hotel.

58.     As Lieutenant Stephen London recalled when interviewed by IPNO in 2009, the
*Times-Picayune* was "all over" the NOPD to solve the murder of one of their own. The Robinson
murder was also big news—making the front page of *Times-Picayune*'s Friday, November 28th
evening edition and its Saturday, November 29th morning edition.

59.     In the afternoon of Saturday, November 29, 1980, Dillmann and Dantagnan
received a telephone call from Gerald Griffin. Griffin was a roustabout who said that around 5:00
a.m. that morning he had accompanied a blonde white man with whom he had been drinking all
night to the Detoxification Center at Charity Hospital. This man was later identified as Mr.
Floyd. According to Griffin, on the walk, Mr. Floyd asked him if he had "heard of the stabbing at
the Fairmont," and Griffin said "no." Later that morning, Griffin read about the Robinson murder
in the Saturday, November 29th morning edition of the *Times-Picayune* and called the police—
believing, mistakenly, that Mr. Floyd knew of the stabbing before it was public knowledge. Even
so, Griffin did not find the interaction particularly suspicious; as Griffin later explained, he
thought it was "one in a million" that his tip would be relevant.

60.     NOPD Detectives undoubtedly knew that the Robinson murder had been covered
in the November 28th Friday evening edition of the *Times Picayune*—especially given that
Robinson's body was discovered by 5:00 a.m. on the morning of the 28th. Indeed, despite
receiving this "tip" from Griffin the week of the murders, NOPD Detectives did not pursue this
information until weeks later when other leads had run dry.

61.     Instead, the NOPD Detectives continued to investigate elsewhere.  On
December 2, 1980, Rice recorded in his supplemental report his belief that McKinney (the
security guard at the Fairmont Roosevelt Hotel) had witnessed the perpetrator of the Robison
murder—a black male—fleeing from the hotel. And on December 3, Rice had Hennessey

(Robinson's friend and the last person to see him alive) fingerprinted for comparison to the prints lifted from the scene and Robinson's vehicle. Hennessey, like Carter, was excluded as the source of the prints. Dillmann also continued to investigate information in the Hines murder, including his November 30, 1980, interview of Clegg—during which Clegg indicated Hines's "taste" for black men (later misrepresented in Dillmann's report).

62.     But with no new leads, and under mounting pressure to close these "heater" cases, NOPD Detectives turned back to Griffin's innocuous tip. At this point, Dillmann was working closely with NOPD Patrolman John Reilly to investigate the murders. Reilly was a career French Quarter patrolman whose particular beat included the Quarter's gay bars; he even worked security detail at a gay bar, the Bourbon Pub, when not on duty. Reilly was well-known in the neighborhood for exploiting vulnerable people—people like Mr. Floyd.

63.     By 1980, Reilly had been acquainted with Mr. Floyd—who was known around the Quarter simply as "Johnny"—for at least two years. Mr. Floyd, then thirty-two years old, was a "drifter" living on and off in the French Quarter since the 1970s. At the time of the murders, he was an alcoholic and a drug user who would sometimes sleep with men in exchange for a place to stay. His lifestyle, combined with his intellectual disability (Mr. Floyd has an IQ of 59 and comprehension skills comparable to those of a third-grader), made him easily exploitable and vulnerable to coercion. Mr. Floyd was therefore an attractive suspect in spite of the obvious inconsistencies between him—a blonde-haired white man—and the true perpetrator—an African-American man.

64.     At that point, the NOPD officers had nothing beyond Griffin's tip to link the innocent Mr. Floyd to the Robinson murder, and absolutely nothing to tie him to the Hines murder—no forensics, no witness, and no alleged admissions.

65.     In early December, Reilly went to the Mississippi River Bottom Bar—a gay bar that was part of his French Quarter beat—to seek information tying Mr. Floyd to the Hines murder. At the bar, Reilly spoke to the owner, Steven Edwards, telling him he wanted information incriminating Mr. Floyd on the Hines murder. Although Edwards was familiar with Mr. Floyd (known to him as "Crazy Johnny" or "Johnny") because Mr. Floyd had been in several drunken, verbal altercations with other patrons at his bar, Edwards did not have any evidence implicating the innocent Mr. Floyd in the Hines murder. But, as a gay man and the owner of a gay bar in the 1980s, Edwards was especially vulnerable to police pressure.

66.     Edwards eventually succumbed to such pressure from Reilly and Dillmann. On December 15, 1980, Dillmann typed up a statement for Edwards to sign. According to the statement, after Edwards told Mr. Floyd he could not come into his bar over the weekend of November 29 and 30th, Mr. Floyd boasted that he "did the guy that got killed," and when Edwards suggested that Floyd was referring to Hines, Floyd agreed. Under pressure from Dillmann and Reilly, Edwards signed the statement.

67.     But Mr. Floyd, who was innocent, never made such a "boast" to Edwards. This statement was coerced and/or fabricated by the officers, who desperately needed *some* link between Mr. Floyd and the Hines murder.

68.     At this point in the investigation, Dillmann classified Mr. Floyd as "a prime suspect for these two homosexual related murders" because he "had been identified by both Stephen Edwards and Gerald Griffin as being the subject bragging in the French Quarter area of the murders." But Dillmann recognized that these vague, drunken statements were insufficient to support even an arrest warrant for Mr. Floyd, let alone to prosecute him for the murders— especially because Mr. Floyd is white, and the physical evidence and sole suspect description all

pointed toward a black male perpetrator. NOPD Defendants were well-aware they would need a confession from Mr. Floyd to have any chance of convicting him for these murders—and Dillmann and Reilly were determined to obtain one, by any means necessary.

**Defendants fabricate false confessions to both crimes and coerce an intoxicated Mr. Floyd into signing them to close the cases.**

69.    To that end, Dillmann and Reilly spent the first few weeks of January personally attempting to locate Mr. Floyd at gay bars in the French Quarter neighborhood—including during their off-duty hours—rather than seek a warrant or put out a departmental communication asking for assistance in locating Mr. Floyd.

70.    On the afternoon of January 19, 1981, Reilly met Dillmann at the Bourbon Orleans Hotel where Dillmann had worked a security detail that morning. Both officers were off-duty and had pre-arranged to visit several neighborhood gay bars in an attempt to locate Mr. Floyd. They in fact visited several bars before successfully locating Mr. Floyd drinking at the Louisiana Purchase Bar—a gay bar in the French Quarter. Reilly, who knew Mr. Floyd previously, introduced Dillmann.

71.    Dillmann and Reilly each purchased at least one drink for themselves and purchased two or more drinks for Mr. Floyd. Dillmann did not include this information in his police report but—after Mr. Floyd reported they bought him "five or six" drinks—he and Reilly both falsely insisted they purchased only one. But in his 1998 interview, Dillmann admitted that they had purchased "drinks," plural, for Mr. Floyd, not a drink, singular.

72.    At that point, Mr. Floyd had been drinking since the morning and had also taken various narcotics so he could stay awake to continue drinking. Dillmann and Reilly were well aware of his state as Dillmann would admit, long after Mr. Floyd's trial, that he understood Mr. Floyd was "whacked out" at the time.

19

73.     Mr. Floyd also had serious cognitive limitations that would have been apparent to Defendants. In particular, Mr. Floyd has an IQ of 59—in the bottom 0.3% of the population—and has reading and comprehension skills comparable to those of a seven or eight-year-old child.

74.     After speaking with Mr. Floyd for some time, Dillmann and Reilly asked him to step outside and accompany them to NOPD Headquarters for questioning. They did not have a warrant for Mr. Floyd's arrest; Dillmann and Reilly recognized they did not have probable cause at this point. As Dillmann would later recount in his novel: "If we had eyewitnesses or reliable physical evidence, or even enough for an arrest warrant, I'd stick a gun in his face, no more planning needed. But he was only a suspect; this wasn't an arrest." Nevertheless, they transported Mr. Floyd to NOPD Headquarters.

75.     Once at the station, Dillmann placed Mr. Floyd in a holding cell for at least thirty minutes. He then took Mr. Floyd to a private office—in NOPD's Rape Section, away from Homicide Division—shut the door and proceeded to question Mr. Floyd alone for a half hour. During that time, Dillmann used threats of physical violence—including that he would put Mr. Floyd's head through the brick wall and that he could kill him and get away with it—as well as actual physical force in an effort to get Mr. Floyd to confess. By Dillmann's own account in his novel, he used such physical force with Mr. Floyd: "I grabbed a handful of his hair with my left hand and the collar of his shirt with my right. I slammed him into the front of the building, keeping him disabled by yanking back on his head and neck." But this information was not disclosed until years after Mr. Floyd's trial; at the time of the prosecution, Dillmann falsely claimed he never used force or threats of violence against Mr. Floyd.

76.     Mr. Floyd, though terrified, initially maintained that he did not commit the murders. After getting nowhere with him, Dillmann decided to show Mr. Floyd two grisly

photographs from the Hines murder to "break" him: one of the scene and one of Hines's body. The fact that Dillmann showed Mr. Floyd these photos—both of which depicted non-public, specific details about the murder scene—was not disclosed until years after Mr. Floyd's trial.

77.     After viewing the disturbing photographs and enduring Dillmann's threats, Mr. Floyd—who was intoxicated and had taken narcotics that morning—became hysterical. At that point, Dillmann called Reilly into the room. Both officers continued to use threats of violence to force Mr. Floyd to confess—including telling him that they could kill him and get away with it, and Reilly threatening that he would make sure Mr. Floyd was beat up by cops in the French Quarter if he didn't confess. Overwhelmed and fearing for his life, Mr. Floyd finally acquiesced. But because Mr. Floyd was innocent and had no knowledge of the crimes, he could not provide a detailed confession himself.

78.     Once Mr. Floyd gave in, Dillmann called Rice—who was off duty at the time—to come down to the station to take a statement about the Robinson murder. The Detectives and Reilly then fabricated confessions from Mr. Floyd.

79.     Only after Mr. Floyd purportedly confessed did Dillmann, Rice, and Reilly have Mr. Floyd—who was noticeably intoxicated, highly emotional, has an IQ of 59, and had told them he only completed school through the sixth grade—sign a written form waiving his *Miranda* rights. Defendants did not employ any safeguards to ensure that Mr. Floyd understood his rights.

80.     After the waiver was signed, from 8:35 p.m. to 10:30 p.m., Detective Dillmann—in the presence of Reilly and Rice—created a six-page written "confession" to the Hines murder. The confession was created to look as if it was given by Mr. Floyd in a Q-and-A format, with

Dillmann posing questions and Floyd volunteering answers. In actuality, the statement was fabricated by Defendants Dillmann and Rice, along with Reilly.

81.     From 10:45 p.m. to 11:55 p.m., Detective Rice—in the conjunction with Dillmann and in the presence of Reilly—similarly fabricated a two-and-a-half page written "confession" to the Robinson murder. Just like the Hines "confession," this one was created in a Q-and-A format, to suggest that Floyd had volunteered information about the crime. In reality, just like the Hines "confession," the Robinson "confession" was also fabricated by Defendants Dillmann and Rice, along with Reilly.

82.     Given that Dillmann, Rice and Reilly fabricated both confessions, it is no surprise that these parallel false confessions are closely linked, with strikingly similar narratives of the alleged crimes:

| HINES NARRATIVE | ROBINSON NARRATIVE |
|---|---|
| "I met this guy on Bourbon St." | "I met him on Bourbon Street next to that gay bar. . ." |
| "I was leaning against a post on bourbon st and he [Hines] walked up to me. We started talking . . ." | "He [Robinson] came up and started to talk to me." |
| "[W]e had a drink in the Bourbon Pub and Lafitte's." | "We stayed in the bar [the Bourbon Pub] for a little while and we left and walked to another bar and had a drink." |
| "We went through the gate into his apartment." | "He opened the door with the key then I walked in behind him" |
| "I went to the bathroom and when I came back, he was naked in the bed." | "I think I went to the bathroom and I think by the time I got out of the bathroom he had his cloths off." |
| "Then he told me that he wanted to fuck me and I went crazy . . . I went berserk." | "He told me he wanted to fuck me and thats when I went berserk." |
| "I had a knife in my boot and I stabbed him a bunch of times." | "I . . . pulled my knife from my left boot and started stabbing him." |
| "[The knife] had a brown handle and the blade was about six inches long." | "[The knife] had a blade about 7 inches long and it had wood handles." |
| "[After the stabbing,] I ran out of the house." | "[After the stabbing,] I ran out of the room." |

| "I went back down on bourbon st. too the bar" | "I ran to Bourbon Street." |
|---|---|

83.    Dillmann, Rice, and Reilly also made sure each confession contained false information intended to bolster the credibility of the vague, otherwise uncorroborated statements given by Griffin and Edwards. The Robinson "confession" states: "After I left the hotel, I ran to Bourbon Street. I talk to this guy, I don't know his name. I was talking to him about the killings and I told him I had just killed a dude. I asked him for help and he took to Charity Hospital to the Detoxification Center and then left." And the Hines "confession" states: "I was so messed up on the pills and the whiskey that I told everyone in the bars [about the murder]."

84.    In his report on the interrogation, Dillmann falsely stated that Mr. Floyd "ha[d] rendered statements in which he stated facts that only the perpetrator could have known." In reality, any nonpublic information in the confessions came from Dillmann, Rice, and Reilly, and the inculpatory "details" contained in the confession all reflected Defendants' perception of the crimes at the time—not the reality.

85.    For example, according to his Hines "confession," Mr. Floyd and Hines were "both drinking" in his apartment prior to having sex. This was consistent with the police understanding from the scene, including the whiskey bottle and two drinking glasses. But Mr. Floyd was later excluded as the source of the fingerprints on the half-full whiskey bottle (as was Hines). Other non-public details Dillmann later relied on as "facts that only the perpetrator" would know included Mr. Floyd's description of entering the property through a gate, the placement of clothes on a chair near the bed, and his negative answer when asked if he removed any money or property from the apartment. But these facts were all known to Defendants as well, as evidenced by their inclusion in Dillmann's report.

86.     According to the Robinson "confession," Mr. Floyd rode in Robinson's car on the way to the hotel. But Mr. Floyd was later excluded as the source of the fingerprints on the passenger side of Robinson's car. Mr. Floyd also purportedly told police that Robinson "parked the car" but "not in the [hotel] parking lot"—a fact that Defendants uncovered during their investigation but that could not have been known to Mr. Floyd, as he never rode in Robinson's car. Mr. Floyd also purportedly told Defendants that, after Robinson performed oral sex on him and he finished, he "wiped [his] dick with a piece of paper and threw it on the floor." At the time of the interrogation, Defendants knew a semen-stained tissue had been found next to Robinson's bed. After Mr. Floyd was arrested, however, he was determined to have Type-B blood and therefore was excluded as the source of the semen on the tissue.

87.     No part of the interrogation (which lasted by Dillmann's own account 5.5 hours, by Mr. Floyd's estimate up to 10 hours) was recorded. Dillmann and Rice both claimed that—despite being experienced homicide detectives—they did not have access to a tape recorder after hours at the NOPD headquarters.

88.     Once Mr. Floyd had signed the "confessions," he was booked into Central Lockup. At that time, his fingerprints and a blood sample were taken.

89.     Three weeks later, on February 12, 1981, Mr. Floyd was indicted for the second-degree murders of William Hines and Rodney Robinson. The indictments were based his allegedly voluntary confessions containing "facts that only the perpetrator could know." To make the confessions appear reliable, Dillmann, Rice, and Reilly all falsely represented that they did not make any threats or use physical violence to coerce Mr. Floyd to confess; that they had not purchased Mr. Floyd multiple drinks prior to his arrest; that Mr. Floyd was not under the

influence of alcohol and narcotics when he was interrogated; and that the non-public information contained in the confessions all originated with Mr. Floyd, not Defendants.

**Defendants discover more exculpatory evidence, and bury the exculpatory fingerprint results in both cases.**

90.     At some point after the confession—but before Mr. Floyd's trial a year later—Defendants learned the results of the blood-type analysis conducted on the blood sample obtained from Mr. Floyd after he was arrested. Specifically, Defendants learned that Mr. Floyd had Type-B blood. That result meant:

> (a) Mr. Floyd was excluded as the source of the semen found on tissue near Robinson's bed, which came from a man with Type-A blood;
>
> (b) Mr. Floyd was excluded as the source of the sperm from the anal swab of Robinson, which had come from a man with Type-A blood;
>
> (c) Mr. Floyd was excluded as the source of the blood found on the skullcap in the hallway near Robinson's body, which was stained with Type-O blood (Robinson's blood type); and
>
> (d) Mr. Floyd could not have been the source of any of the blood found at the Hines murder scene, all of which came from an individual (or individuals) with Type-A blood (Hines's blood type);

91.     When combined with the forensic evidence and witness statements known to Defendants before Mr. Floyd's arrest—that pubic hairs recovered from Hines's bed were African-American in origin, that the hairs recovered from the blood-stained cap were also African-American in origin but did not match Robinson, that Hines had a preference for black partners, and that a witness had seen a black man fleeing the hotel immediately after Robinson's

murder—Defendants possessed before trial overwhelming evidence that a black man with Type-A blood, not Mr. Floyd, had committed both of these murders.

92.     Mr. Floyd's fingerprints were also taken when he was arrested, and Dillmann and Rice requested that his fingerprints be compared to the latent prints taken from both the Hines and Robinson scenes, from places the perpetrator was believed to have touched. The victims and other potential innocent sources had already been excluded as the source of these prints, making it especially likely these prints had been left by the perpetrator. Dillmann and Rice subsequently learned that:

> (a) Mr. Floyd was excluded as the source of the fingerprints lifted off the half-filled whiskey bottle at the Hines murder scene;
>
> (b) Mr. Floyd was excluded as the source of the fingerprints lifted off the half-filled whiskey glass next to Robinson's bed; and
>
> (c) Mr. Floyd was excluded as the source of the fingerprints lifted off the passenger side of Robinson's car.

93.     As Dillmann and Rice understood, pursuant to NOPD custom and practice at the time, the Latent Print Unit would not produce a written report documenting these exclusionary results. As Dillmann and Rice also understood, pursuant to the customs and practices of the DA's Office, the prosecutor would rely on the investigating officers to produce information to them about the investigation, including any exculpatory information, and would not reach out to the Latent Print Unit to seek out information that was not affirmatively provided to them. Dillmann and Rice nevertheless failed to record these exculpatory findings in their case files or otherwise provide the exculpatory fingerprint exclusions to the prosecutor or defense.

**Defendants fabricate another alleged admission from Mr. Floyd to shore up the Robinson case.**

94.     Once Defendants learned that Mr. Floyd was excluded as the source of the semen at the Robinson scene, they recognized that this exculpatory evidence—which was recorded in a Crime Laboratory Report that would be produced to the district attorney—could not be suppressed and would undermine portions of Mr. Floyd's "confession" (specifically, that Mr. Floyd wiped his semen on the tissue found near the bed). In an effort to shore up the case against Mr. Floyd, Defendants fabricated a new "admission" to the Robinson murder allegedly made by Mr. Floyd to Byron Gene Reed, an acquaintance and former sexual partner of Mr. Floyd's.

95.     According to Reed: he encountered Mr. Floyd sometime after Christmas of 1980; Mr. Floyd asked him for money; when he refused, Mr. Floyd said he'd "take care of [Reed] like he did the one at the Fairmont."

96.     But Mr. Floyd, who was innocent, never made such a statement to Reed. At that time, Reed was a gay man living in the French Quarter in the 1980s and so was particularly susceptible to police pressure. Upon information and belief, Dillmann and Reilly threatened and/or coerced Reed into providing this false account.

**Defendants suppress critical exculpatory evidence at trial, leading to Mr. Floyd's conviction for the Hines murder.**

97.     Prior to trial, Mr. Floyd moved to suppress both confessions on the basis that they were not voluntarily given. At the hearing on the motion, Mr. Floyd testified to the physical and verbal coercion used by Dillmann and Reilly to force him to confess. Dillmann falsely testified—consistently with his prior written and oral reports—that he never placed Mr. Floyd in a holding cell (testimony he recanted at trial), and that he never beat or threatened Mr. Floyd— who he claimed gave the verbatim statements voluntarily. Based on that false evidence, Mr. Floyd's motion was denied.

98.     Mr. Floyd's case was tried on January 5 and January 6, 1982, in a bench trial in front of Judge Winsberg.

99.     The State's case at trial consisted of the two fabricated confessions, the innocuous statement Floyd made to Griffin, and the coerced/fabricated statements from Edwards and Reed, claiming Mr. Floyd had made drunken admissions about the Hines and Robinson murders, respectively. No physical or forensic evidence implicated Mr. Floyd in either murder, and no witness ever claimed to have seen Mr. Floyd with either victim at any time. No murder weapon was ever located and no one had ever seen Mr. Floyd carry a knife.

100.    The defense case relied primarily on the exculpatory forensic evidence that had been disclosed, almost all of which related to the Robinson murder. In particular, the defense presented evidence that because Mr. Floyd had Type-B blood, he was not the source of the semen found on the tissue near Robinson's bed or in Robinson's anus. With respect to the blood-soaked cap found near Robinson, the defense presented evidence that the blood on the cap was from Robinson (who was Type O) but that the hair inside the cap came from a different African-American individual—and so could not have come from Mr. Floyd. The defense also put on a corroborating eyewitness, the security guard, who saw a hat-less black man flee from the hotel immediately after the Robinson murder. As for the Hines murder, the defense presented evidence that pubic hairs recovered from Hines's bedsheets belonged to an African-American individual. Because Hines's body was discovered more than 24 hours after his murder, there was no seminal fluid suitable for testing on his body; and the rest of the exculpatory evidence—including the fingerprint exclusion and Hines's preference for black men—was suppressed by Defendants and so was not presented.

101.     John Floyd also took the stand in his own defense. Mr. Floyd truthfully denied committing either murder, provided an alibi—including bus tickets—for the days immediately preceding the Hines murder, and explained that he confessed only because Dillmann and Reilly used physical coercion and threats that made him terrified for his life. Mr. Floyd also explained as best he could that, once he acquiesced, the officers fed him specific details about the murder during the interrogation. Mr. Floyd's intellectual limitations were apparent in his testimony: he was often confused by questions and, when asked by the prosecutor to read a portion of his "confess" to the Hines murder, he was unable to do so.

102.     On January 6, 1982, Mr. Floyd was convicted of the second-degree murder of Hines but acquitted of the second-degree murder of Robinson. The State's case against Mr. Floyd was essentially the same for both murders: one vague, drunken alleged admission each (from Edwards and Reed), and parallel confessions with strikingly similar narratives taken at the exact same time. But in the Robinson case, the court treated Mr. Floyd's alleged confession as unreliable in light of the forensic evidence demonstrating he was not the perpetrator. In the Hines case, the exculpatory fingerprint evidence was suppressed by Defendants. The court thus credited Mr. Floyd's confession to the Hines murder—a particularly inconsistent result given that, in the Hines confession itself, Mr. Floyd also allegedly admitted to committing the Robinson murder.

103.     On January 21, 1982, Mr. Floyd was sentenced to mandatory life without the possibility of parole.

**Mr. Floyd's fight to prove his innocence leads to the discovery of the critical, exculpatory evidence suppressed by NOPD Defendants.**

104.     Mr. Floyd was sent to the Louisiana State Penitentiary (Angola) to serve his sentence. Though he was indigent and intellectually disabled, Mr. Floyd went to great lengths over the next several decades to find help in proving his innocence—writing thousands of letters

to hundreds of people and organizations asserting his innocence and begging for help. Once Mr. Floyd learned about IPNO, which was not founded until 2001, he wrote hundreds of letters seeking their assistance (which continued even after IPNO was able to take his case, due to Mr. Floyd's cognitive limitations). Because of Mr. Floyd's intellectual limitations, these letters were extremely repetitive but all contained the same message: that he was innocent and needed help. Indeed, the phrase "You have a [*sic*] innocent man here" appears in over two hundred of Mr. Floyd's letters to IPNO. The phrase "I am begging you to see to it that justice is done in this case" also appears in over two hundred of his letters.

105.    After IPNO agreed to take Mr. Floyd's case in 2004, it uncovered significant exculpatory evidence that was unavailable at the time of trial. The vast majority of this evidence was known to NOPD Defendants at the time but suppressed to secure Mr. Floyd's wrongful conviction.

106.    On September 29, 2008, IPNO obtained copies of the NOPD Latent Print Unit's logbook and the envelopes in which the prints recovered from the Hines and Robinson crime scenes were stored. Mr. Floyd—who was fingerprinted by the NOPD after he was alleged to have confessed on January 19, 1981—was excluded as the source of all relevant prints. In particular:

(a)      <u>Hines Murder</u>: Police found two half-filled whiskey glasses (one from the nightstand in Hines's bedroom, one on the kitchen table) and a bottle of whiskey on his kitchen table. The glasses yielded no usable prints. But the prints lifted from the whiskey bottle excluded both Hines and Mr. Floyd, as indicated by the notations: "NOT VICTIM" and "NOT JOHN FLOYD."

(b)     <u>Robinson Murder (glasses)</u>: Police found two half-filled whiskey glasses, one on each side table next to the bed in Robinson's hotel room. The prints lifted from one glass matched Robinson. The prints lifted from the other glass excluded Robinson, his friend David Hennessey, alternative suspect O.W. Carter, and Mr. Floyd. These exclusions were indicated by the notations: "NOT VICTIM" and "NOT O.W. CARTER or DAVID HENNESSEY" on the left-hand side of the card, "NOT JOHN FLOYD" on the right-hand side— with an additional "WANTED: UNKNOWN" notation along the bottom.

(c)     <u>Robinson murder (car)</u>: Because Robinson picked up the perpetrator in his car and brought him back to his hotel, police lifted prints from the passenger side of Robinson's car. These prints excluded Robinson, Hennessey (the last person known to be in his car prior to the perpetrator), alternative suspect O.W. Carter, and Mr. Floyd. These exclusions were indicated by the notations: "NOT VICTIM" and "NOT O.W. CARTER or DAVID HENNESSEY" on the left-hand side of the card, "NOT JOHN FLOYD" on the right-hand side.

107.    On November 22, 2011, the NOPD Latent Print Unit re-analyzed the fingerprints and fingerprint comparisons of Mr. Floyd and O.W. Carter to confirm that the notations were accurate. Mr. Floyd was yet again excluded as the source of the prints from both crime scenes, as was O.W. Carter.

108.    These results were highly exculpatory: for Hines, they demonstrated that the victim shared a drink with someone other than Mr. Floyd immediately before his murder; for Robinson, they demonstrated that Robinson picked up a passenger—that was not Mr. Floyd—

after dropping off his friend Hennessey, and then shared a drink with that person—again, not Mr. Floyd—immediately before his murder.

109.     These fingerprint comparisons and results were logged and known by NOPD officers and analysts before Mr. Floyd's trial, but were withheld from the prosecution. This comparison information does not appear anywhere in the District Attorney's file, and none of the prosecutors working on the case ever knew this information at the time of the prosecution. As a result, this exculpatory information was not available to the defense at the time of Mr. Floyd's trial.

110.     In May 2008, IPNO also located John Rue Clegg, a close personal friend of Hines who had provided a statement to Dillmann shortly after the murder. According to Dillmann's police report: "Mr. Clegg stated that to his knowledge the victim was homosexual and frequently had sexual relations with *both* black and white males." (emphasis added). Dillmann also testified to the same at trial. This reported statement from Clegg was particularly significant given that other evidence consistently suggested the perpetrator of both the Hines and Robinson murders was black, while Mr. Floyd is white. But Clegg never made this statement to Dillmann. During his interview, Clegg told Dillmann that Hines's "taste was for black men" as he knew this to be true—based both his observations of Hines's partners and conversations with Hines on the topic. Clegg, who has no connection to Mr. Floyd, executed an affidavit to this effect in June 2008.

111.     In other words, Dillmann fabricated a statement falsely including white men (like Mr. Floyd) among the set of likely perpetrators of the Hines murder and withheld the true, exculpatory account Clegg actually gave from the prosecution and defense. Clegg's actual account (that Hines's preference was consistently for black men) does not appear anywhere in the DA's file and was not known to any of the prosecutors at the time of the prosecution. When

IPNO received this new fingerprint evidence in September 2008, it was also disclosed that NOPD Defendants pursued an alternative black suspect, as the notations "NOT O.W. CARTER" appeared on the fingerprint envelopes. Carter was a black man with a prior record. This information was known to NOPD Defendants, but no alternative suspects are discussed in the police reports prepared by Dillmann and Rice and transmitted to the prosecution. And no alternative suspects were mentioned in the State's discovery response or at trial. Had this information been disclosed to the prosecution and the defense, it would have supported the theory that a black man committed both crimes and impeached Dillmann's testimony that the evidence did not indicate to him that a black male suspect should be pursued.

112.    In 1998, Jupiter Entertainment interviewed several people involved in the investigations of the Robinson and Hines murders, including Dillmann, for a potential A&E documentary. This documentary ultimately never aired, but IPNO acquired the transcript in 2005. In his interview, Dillmann described Mr. Floyd's interrogation: "Finally we got to the point, I think what finally broke him was I showed him some of the scene photographs . . . . I forget which one I showed him, I showed him one of the scene photographs and one of the bodies." This statement corroborated Dillmann's account of having shown Mr. Floyd two photographs during the interrogation, contained in his book *Blood Warning* published in 1989. In his book, Dillmann recounts: "A malicious thought, a lightning strike came to me: *If Floyd wants to see Bill Hines, let him see the way he left him*. I selected two of the grisliest shots . . . [p]hotos a jury would never see because they were too hideous. . . . It might work. What I had in mind might crack him."

113.    On January 9, 2017, Dillmann was deposed in another § 1983 wrongful conviction case: *Adams v. City of New Orleans* (No. 15-1543). While under oath in that

deposition, he admitted that he did show Mr. Floyd two photographs from the scene of the

murder—one of the scene, one of the body—and that Mr. Floyd did not confess until after

Dillmann showed him the photographs.

114.    The fact that Dillmann showed Mr. Floyd these two photographs does not appear

anywhere in his police report: not in his narrative account of Mr. Floyd's interrogation or in Mr.

Floyd's formal "confession" to the Hines murder. To the contrary, Dillmann's report concludes:

"John Floyd has rendered statements in which he stated facts that only the perpetrator could have

known." And Dillmann later testified that Mr. Floyd's confession to the Hines murder was

credible because it contained details of the crime scene and victim's appearance that only a

person "who had been there" would have known. The prosecutors were not otherwise aware of

this information at the time of the prosecution.

115.    In 1987, the Louisiana Supreme Court published an opinion suppressing a 1978

confession obtained by Dillmann and two other NOPD detectives. *State v. Seward*, 509 So. 2d

413 (La. 1987). The defendant, Seward, contended that to obtain his confession, the NOPD

detectives—led by Dillmann—"repeatedly hit him in the head, kicked and hit him in the chest

and back, pushed him to the floor, and placed a plastic bag over his head. The officers also

allegedly threatened, swore and screamed at [him] in an effort to elicit a confession. The doctor

who examined Seward testified that he had "objective signs of injury consistent with a police

beating," leading the Court to find that "the evidence preponderantly establishe[d] that Seward

was beaten." But this reversal did not come until 1987. At the time of Mr. Floyd's interrogation

in 1981, Seward's confession had been admitted and he was convicted of murder—allowing

Dillmann to believe, based on what happened in that case, that he knew how to get away with

beating a suspect into confessing. And had this information been known to Mr. Floyd or his

counsel, it would have significantly strengthened Mr. Floyd's testimony at the suppression hearing and trial that he was beaten by Dillmann—particularly because Seward's description of his beating was similar to Mr. Floyd's.

116.    In sum, the following additional exculpatory evidence would have been available at Mr. Floyd's trial had it not been suppressed by the NOPD Defendants: (1) that Mr. Floyd was not the source of fingerprints recovered from the Hines crime scene and believed to have been left by the perpetrator; (2) that Mr. Floyd was not the source of fingerprints recovered from the Robinson crime scene and Robinson's car and believed to have been left by the perpetrator; (3) that Clegg told Dillmann at the outset of his investigation that Hines preferred black men as partners; that the NOPD originally pursued at least one black male suspect, O.W. Carter; (4) that Dillmann showed Mr. Floyd two pictures of the Hines's crime scene before he "confessed" to the crime, undermining claims that Mr. Floyd knew details only the true perpetrator could know; and (5) that, three years prior, Dillmann used physical force and threats to coerce a confession from a suspect, in the same manner described by Mr. Floyd.

117.    IPNO also secured additional evidence of Mr. Floyd's innocence through scientific testing unavailable at the time of trial. In 2007, IPNO had mitochondrial DNA testing performed on the hair samples collected from the Robinson crime scene (similar testing could not be conducted on forensic evidence from the Hines scene, as the NOPD reported it was lost or destroyed years prior). This testing definitively excluded Mr. Floyd as the source of any of the hairs recovered from the Robinson crime scene. It also confirmed that the hair profiles came from two different individuals—both African-American—in other words, from Robinson and the true perpetrator.

**Mr. Floyd's conviction is overturned on the basis of this exculpatory evidence.**

118.    Based on this extensive new exculpatory evidence, on September 14, 2016, the United States District Court for the Eastern District of Louisiana made an extremely rare finding that Mr. Floyd had met the *Schlup* standard to prove a miscarriage of justice. This ruling allowed Mr. Floyd to proceed with his otherwise time-barred petition for writ of habeas corpus based on compelling evidence of actual innocence. On May 8, 2017, the district court granted Mr. Floyd's petition on the merits: finding that the State suppressed favorable, material evidence (specifically, the fingerprint comparison results and Clegg's statement) in violation of *Brady* and its progeny. That order was suspended (and the conviction remained in effect) while the State appealed, although the State consented in June 2017 to release Mr. Floyd on supervised parole while the appeal was pending.

119.    On April 6, 2018, the Fifth Circuit affirmed the district court's grant; the ruling did not go into effect, though, because the State then sought rehearing *en banc*. Two months later, on June 25, 2018, the Fifth Circuit issued a new decision denying the State's motion for rehearing *en banc* and re-affirming the district court's ruling on both grounds—that Mr. Floyd had produced evidence of actual innocence sufficient to provide a gateway to consider his time-barred claims on the merits, and that he was entitled to relief on the merits based on the State's unconstitutional suppression of exculpatory evidence in violation of *Brady*. The mandate issued on July 17, 2018, but the judgment invalidating Mr. Floyd's conviction still did not go into effect because the State sought *certiorari* from the United States Supreme Court.

120.    On November 19, 2018, the Supreme Court denied the State's petition for a writ of *certiorari*, and the federal decision invalidating Mr. Floyd's conviction finally went into effect. The charges against Mr. Floyd were dismissed the following day, on November 20, 2018.

At that point, Mr. Floyd was 69 years old and had spent over 36 years wrongfully incarcerated for a crime he did not commit.

### The NOPD's policy, custom, and practice of not producing written reports for exculpatory fingerprint comparison results.

121.    Prior to and at the time of the unlawful investigation, prosecution, and incarceration of Mr. Floyd, New Orleans and the New Orleans Police Department, by and through its final policymakers, maintained an official policy, custom, or practice of suppressing exculpatory fingerprint comparison evidence as follows:

122.    By official policy, practice, and custom, the NOPD's Latent Print Unit would generate a written report *only* when a suspect's fingerprints matched the print or prints against which they were run. In other words, as a matter of official policy and practice, the NOPD's Latent Print Unit would *not* generate a written report when either: (1) the prints were not suitable for comparison (i.e., the results were inconclusive), or (2) a suspect's fingerprints did not match the print or prints against which they were run.

123.    Official written reports created by the NOPD Latent Print Unit would be produced to the prosecutor and included in the prosecutor's file. By contrast, internal NOPD Latent Print Unit documents such as the logbook and the envelopes in which the prints were stored with the NOPD would not be produced to anyone outside the Latent Print Unit—specifically, these documents would not be produced to the investigating officers or to the prosecution.

124.    As a result of this policy and practice, such exculpatory fingerprint results were documented only in the NOPD Latent Unit's logbook and the envelopes in which the prints were stored with the NOPD—documents which by official policy, practice and custom were never produced to the investigating officers or to the prosecutors.

125.    By official policy, practice, and custom, the NOPD's Latent Print Unit would only orally report to the investigating officers when a requested comparison of suspect's prints resulted in an exclusion, rather than create a written report. But by official policy, practice, and custom, there was no requirement that this orally reported exculpatory fingerprint information be recorded in any written report by the investigating officers, either. Rather, because the NOPD Latent Print Unit issued its own written reports for any inculpatory evidence (matches between suspects' fingerprints and comparison prints), if anything the custom would be not to independently report information recounted by the NOPD Latent Print Unit.

126.    These customs, policies and practices of not creating any written report of fingerprint comparisons that resulted in exclusions or otherwise making those exculpatory results known to the prosecutor were the operating procedure of the NOPD Latent Print Unit at the time. It was universally known within the NOPD command structure and detectives that the NOPD Latent Print Unit only created written reports for fingerprint matches. This operating procedure was either directly commanded by the final policymakers for the NOPD and City of New Orleans or, in the alternative, was known to those policymakers who permitted it to continue in deliberate indifference to the likelihood it would result in violations of the constitutional rights of suspects.

127.    The need for exculpatory forensic information to be recorded in a written report so that it would be produced to the prosecution was both obvious and well known before 1980. Indeed, during this same time period, the NOPD Crime Lab created written reports that included both inculpatory and exculpatory evidence and produced those reports to the prosecution. For example, in this case, exculpatory evidence regarding blood and hair evidence from the Hines and Robinson scenes was recorded in written reports created by the Crime Lab and produced to

the prosecution; as a result, this exculpatory evidence was known to the prosecution, defense, and court at the time of Mr. Floyd's trial.

128.     Nevertheless, the NOPD and City of New Orleans, by and through its final policymakers, implemented the policies, practices and customs of not creating written reports of fingerprint exclusions in deliberate indifference to the substantial likelihood that these customs, practices and policies would result in constitutional violations like those that occurred in Mr. Floyd's case.

129.     These policies, customs and practices of the NOPD and City of New Orleans were the moving force behind the suppression of the exculpatory fingerprint exclusion in Mr. Floyd's case, and thus of his wrongful conviction on January 6, 1982.

130.     Indeed, Mr. Floyd was not the only suspect who was deprived of exculpatory fingerprint evidence at trial as a result of these customs, practices and policies. For example, Bobbie Jean Johnson was arrested for the 1977 murder and robbery of New Orleans antiques dealer Arthur Samson. At her 1978 trial, Johnson maintained her innocence; like Mr. Floyd, she claimed NOPD Detectives had coerced her into falsely confessing, and other evidence pointed away from her as the killer. However, the prosecution, defense and court were not made aware that both Johnson and her alleged accomplice had been excluded as the source of significant fingerprints from the crime scene. Just as in Mr. Floyd's case, this information was recorded only on internal NOPD Latent Print Unit documents; no written report was of this exculpatory evidence was ever generated. Without any disclosed written record, the investigating detective misrepresented to the prosecutor that the prints were not suitable for comparison.

**The NOPD's policy, custom, or pattern and practice of condoning corruption,
including widespread investigative misconduct.**

*Suppression of Exculpatory Evidence*

131.     Prior to and at the time of the unlawful investigation, prosecution, and

incarceration of Mr. Floyd, New Orleans and the New Orleans Police Department, by and

through its final policymakers, maintained a policy, custom, or pattern and practice of

suppressing exculpatory evidence, in violation of *Brady*.

132.     A limited pre-complaint investigation identified numerous similar *Brady*

violations committed by the NOPD. These violations and other relevant evidence paint a picture

of a police department that—as a matter of custom, practice, and policy—simply disregarded its

*Brady* obligations.

133.     The NOPD's unconstitutional custom, practice, and policy concerning *Brady* is

illustrated by the following incidents, which occurred during the relevant period.

134.     <u>*Norman Clark:*</u> In 1974, Norman Clark was convicted of heroin distribution.

Clark's defense secured subpoenas compelling testimony of material eyewitnesses to the charged

drug transactions. However, these eyewitnesses—police informants—"were made unavailable"

because they "had been sent to Florida with spending money and at government expense through

the combined efforts of state and federal officials." An NOPD lieutenant testified at Mr. Clark's

trial "that it had been his suggestion to send [the eyewitnesses] out of Louisiana." Indeed, it was

the NOPD lieutenant who provided the eyewitnesses with spending money for their trip. After

Mr. Clark was convicted, one of those eyewitnesses came forth with exculpatory testimony. In

subsequent federal habeas proceedings, the United States Court of Appeals for the Fifth Circuit

concluded the NOPD had "flagrantly violated" Mr. Clark's constitutional right to due process and his "conviction [could not] be allowed to stand."[1]

135.    _Raymond Lockett_: In 1974, Raymond Lockett was also convicted of heroin distribution. "The State's evidence at trial tended to show that Lockett sold heroin to an undercover agent in the presence of two confidential informants," but when Mr. Lockett's lawyer "attempted to locate and subpoena" those informants, "[h]e was unable to do so," because the government had "willfully concealed [them] from the trial court." In other words, "the State had deliberately made key witnesses unavailable for [Mr. Clark's] trial." The two informants who would have testified at Mr. Lockett's trial were the same two informants who would have testified at Mr. Clark's, and the same NOPD lieutenant orchestrated their unavailability. The Fifth Circuit later concluded that the NOPD's "concealment of a named eyewitness whose testimony would admittedly be material constitute[d] a prima facie deprivation of due process."[2]

136.    _Curtis Lee Kyles:_ In 1984, Curtis Lee Kyles was convicted of first-degree murder and sentenced to death. Although his defense requested any exculpatory or impeachment evidence before trial, the State responded that there was "no exculpatory evidence of any nature." However, following Mr. Kyles's conviction, it emerged that the State had evidence that "would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid." Before the United States Supreme Court, the State of Louisiana conceded that "some of

---

[1] _Clark v. Blackburn_, 632 F.2d 531 (5th Cir. 1980).

[2] _Lockett v. Blackburn_, 571 F.2d 309 (5th Cir. 1978).

the favorable evidence in issue . . . was not disclosed . . . to the prosecutor until after trial," even though it had been "known . . . to [NOPD] police investigators." In other words, the NOPD's failure to turn over material, exculpatory evidence caused the *Brady* violations at Mr. Kyles's trial. The Court specifically admonished Detective Dillmann, the lead investigator, for preventing the defense from using a witness's inculpatory statements "to throw the reliability of the investigation into doubt and to sully the credibility of Detective Dillman[n]." Additionally, Darlene Kersh, the witness who identified Kyles at trial, later recanted her testimony, disclosing that Detective Dillmann coerced her to lie on the stand. The Supreme Court ultimately held that Mr. Kyles was entitled to a new trial because "the net effect of the evidence withheld by the State . . . raise[d] a reasonable probability that its disclosure would have produced a different result."[3]

137.   *Issac Knapper*: In 1979, Issac Knapper was convicted of the armed robbery and first-degree murder of Dr. Ronald Banks. On appeal it was discovered that Detective Dillmann, the lead investigator, had failed to turn over his report, which contained exculpatory evidence, before Knapper was convicted. The undisclosed report contradicted evidence put on by the State and Detective Dillmann at trial, including differing witness descriptions of the perpetrator, and confirmation that the gun used to kill Banks was the same gun used in a similar armed robbery in the area just a month earlier for which the gunman was identified. The court found that Dillmann's report was not only withheld from defense counsel but that it contained extremely favorable and exonerating evidence in violation of *Brady*, leading the court to overturn Knapper's conviction.[4]

---

[3] *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

[4] *State v. Knapper,* 579 So. 2d 956 (La. 1991).

138.     *Reginald Adams*: In 1980, Reginald Adams was convicted of the murder of Cathy Ulfers, the wife of a NOPD officer. Adams was interrogated for five hours by NOPD homicide detectives, including Detective Martin Venezia, who then said that Adams confessed - the only evidence used against him at trial. The Innocence Project investigated the case, and found a supplemental NOPD report in an unrelated DA's file. The report revealed that homicide detectives found the murder weapon almost a year before Adams "confession", traced it to individuals with access to it shortly before the murder, and subsequently arrested one of them – on whom they found a bracelet stolen from Ulfers' home. Additionally, the Innocence Project found log books and forensic analyst notes showing that Adams and many other suspects were excluded as the source of the fingerprints gathered at the crime scene, but no report was generated by the NOPD and no report was ever given to the defense. This critical information was suppressed and made it clear that the NOPD detectives testified falsely at Adams' trial. Adam's conviction and sentence were later vacated and the State dropped its case against Adams.[5]

### Coercion of Involuntary Confessions

139.     Prior to and at the time of the unlawful investigation, prosecution, and incarceration of Mr. Floyd, New Orleans and the New Orleans Police Department, by and through its final policymakers, maintained a policy, custom, or pattern and practice of coercing involuntary confessions, in violation of the Fifth and Fourteenth Amendments.

140.     A limited pre-complaint investigation identified numerous similar violations committed by the NOPD. These violations and other relevant evidence paint a picture of a police

---

[5] *State v. Adams*, 550 So. 2d 595 (La. 1989).

department that—as a matter of custom, practice, and policy—simply disregarded its obligation to refrain from coercing involuntary confessions.

141.    The NOPD's unconstitutional custom, practice, and policy of coercing confessions is illustrated by the following incidents, which occurred during the relevant period.

142.    _Toxi Jackson_: In 1978, Toxi Jackson was charged with possession of a controlled substance with intent to distribute. One of the most important pieces of evidence against her was a confession she gave to the NOPD. However, the trial judge excluded her confession in a pre-trial suppression hearing on the ground that it had been involuntarily given, based on the conduct of the NOPD officers, and the Supreme Court of Louisiana affirmed the ruling.[6]

143.    _Kevin Seward_: In 1979, Kevin Seward was convicted of first-degree murder. Mr. Seward's confession was allegedly given to Detective Dillmann, the lead investigator, and was introduced at trial over the objection of defense counsel. Mr. Seward later challenged his conviction on the grounds that his coerced confession, a product of physical violence and threats by NOPD officers and detectives, should have been excluded. The Louisiana Supreme Court agreed that Mr. Seward's confession had not been "freely and voluntarily given" and reversed his conviction.[7]

144.    _Harold Taylor, John Bonner, and Ruben Scott:_ In 1974, murder charges were brought against Harold Taylor, John Bonner, and Ruben Scott in connection with the killing of a police officer. The defendants' signed confessions were the principal evidence against them. However, the court dismissed the charges against them when information surfaced that their confessions had been coerced by the NOPD during interrogation.[8]

---

[6] _State v. Jackson_, 381 So. 2d 485 (La. 1980).

[7] _State v. Seward_, 509 So. 2d 413 (La. 1987).

[8] _See generally_ Andrea J. Ritchie & Joey L. Mogul, _In the Shadows of the War on Terror:_

145.  _Bobbie Jean Johnson_: In 1977, Bobbie Jean Johnson was convicted of the murder of Arthur Samson. Johnson alleged that the NOPD detectives "bagged" her during her interrogation, and alleged that they stuffed her head inside a plastic bag to the point of near suffocation in order to coerce a confession from her. Johnson later accepted a time-served plea in exchange for the vacating of her conviction, which occurred while other _Brady_ violations, including the suppression of exculpatory fingerprint evidence, were being litigated against the NOPD.

146.  As the preceding cases demonstrate and as this Court has recently observed, "the NOPD's failings" with regards to investigative techniques "are notorious and have been extensively documented."[9]

147.  Despite notice that such misconduct was ongoing in the NOPD, upon information and belief the policymakers, in deliberate indifference to substantial risk that similar constitutional violations would recur in the future, took no action to discipline officers who had committed such violations, improve policies, supervision, and/or training on these topics, or otherwise prevent such violations from occurring. As a predictable result of those failures to act, Mr. Floyd was wrongly convicted after an unconstitutional trial based on false confessions fabricated and coerced by Defendant officers, in violation of Fifth and Fourteenth Amendment rights.

**The "Code of Silence" and Police Misconduct**

148.  Prior to and at the time of the unlawful investigation, prosecution, and incarceration of Mr. Floyd, New Orleans and the New Orleans Police Department, by and

---

_Persistent Police Brutality and Abuse of People of Color in the United States_, 1 DEPAUL J. FOR SOC. JUST. 175, 189–90 (2008).

[9] _Hill v. New Orleans City,_ No. 13-cv-2463, 2015 WL 222185, at *17 (E.D. La. Jan. 13, 2015).

through its final policymakers, maintained a custom or practice of a "code of silence," pursuant to which police misconduct—including but not limited to the improper use of force, manufacture of evidence, and suppression of exculpatory evidence—was routinely not reported by fellow officers or disciplined or held accountable by the department. To the contrary, officers acting pursuant to the code would customarily engage in misconduct themselves to cover up any misconduct they witnessed by a fellow officer.

149.    Senior policymakers at NOPD at the time of Mr. Floyd's arrest and conviction, including Superintendent Parsons, were aware of the existence of the "code of silence," and of rampant police misconduct and a culture of unaccountability that resulted from this custom, and were deliberately indifferent to its consequences, including that it caused constitutional violations.

150.    In 1979, Superintendent Parsons testified at a jury trial that a "code of silence" existed at the NOPD.[10] In that case, the City of New Orleans stipulated that the plaintiff, wrongfully-discharged NOPD officer Randolph Thomas, was the "first officer in ten years to lodge a complaint against a fellow officer for depriving a civilian of civil rights or for using unnecessary force in accomplishing an arrest."[11] Officer Thomas was retaliated against and discharged because he broke the "code of silence." Superintendent Parsons testified that he had considered taking steps to protect officers who broke the "code of silence," such as Randolph Thomas, but that he did not do so.

151.    In 1981, NOPD paramedic Christopher Hero was wrongfully dismissed in retaliation for reporting to the Internal Affairs Division unlawful conduct of a police officer. The

---

[10] *Thomas v. City of New Orleans,* 687 F.2d 80, 82 (5th Cir. 1982).

[11] *Id.* at 83.

City of New Orleans Civil Service Commission reinstated Mr. Hero and found that he had

"established beyond doubt that a 'code of silence' does operate within the New Orleans Police

Department…" *See Christopher Hero v. Dep't of Police,* No. 1775 (Civil Service Commission,

City of New Orleans, Mar. 17, 1983).

152.    Prior to the *Thomas* and *Hero* cases, the NOPD had been put on notice that its

disciplinary procedures were inadequate and fostered a culture of police protectionism. A 1975

report on citizen complaints at the NOPD by McManis Associates, Inc., warned that the NOPD

"suffers from the absence of clearly defined and enforced ground rules of behavior," and that the

Department's mishandling of civilian complaints was "one of the main reasons police personnel

feel free to behave as they wish in most instances." The report found that "constraints and

pressures" worked against NOPD superior officers who were investigating civilian complaints,

including "accusations by [the superior officer's] peers of taking the word of a citizen or citizens

against that of his fellow officer."

153.    Notwithstanding these warnings, the NOPD failed to institute meaningful reforms

that would have constrained police misconduct, properly investigated civilian complaints, and

addressed the "code of silence" at the NOPD. In the years following the McManis Associates

report, police brutality was a widely recognized problem at the NOPD. This kind of misconduct

is particularly indicative of a "code of silence" because it often occurs in the presence of, or with

the knowledge of, other officers.

154.    In 1977, New Orleans Mayor Ernest Morial pledged to do something about the

police brutality problem, and in 1978 Superintendent Parsons held public forums on the subject.

The New Orleans City Council created seven civilian positions at the Internal Affairs Division in

an effort to institute some civilian oversight, but only one civilian position was ever filled.

155.     The problem continued unabated. On information and belief, out of 198 citizen complaints in 1979 against an officer, only 5 were sustained. During the year 1980-81, the NOPD ranked first in the country on number of police brutality complaints investigated by the FBI—66 cases, compared to 10 in New York City and 5 in Atlanta. In 1981, the lone civilian Internal Affairs Division member, Harry Tervalon, stated to the press that only two out of 62 brutality complaints lodged in the first half of 1980 were sustained.

156.     One example of rampant police misconduct was the "Algiers Seven" case, which arose out of brutal interrogations and deadly police raids in the Algiers area of New Orleans in November 1980, following the death of NOPD Officer Gregory Neupert, Martin Venezia, who oversaw the collection of physical and forensic evidence in the Hines and Robinson murders, participated in or assisted at least two of these interrogations, of Raymond Hughes and Clarence Green. The day after the deadly police raids, and before any investigation had been undertaken, senior NOPD officials, including Superintendent Parsons, defended the raids and asserted that the officers shot in self-defense. One police officer, homicide detective Oris Buckner, broke the "code of silence" and told investigators that the police shooting victims did not have guns. He later testified that his fellow officers brutally interrogated and tortured individuals believed to have information on Officer Neupert's death. He testified that he joined in the beatings after an NOPD Sergeant told him the other homicide detectives did not trust Mr. Buckner because he never hit suspects. As a consequence of breaking the "code of silence," Officer Buckner was harassed, called a "rat," received threats, and was forced to request a transfer out of the homicide division.

157.     Seven NOPD officers, known as the "Algiers Seven," were criminally indicted by the federal government and tried in connection with the brutal interrogations, and three NOPD

officers were ultimately convicted. Mr. Venezia was not among the officers indicted, although he was a party to one or more civil lawsuits that resulted in a $2.8 million settlement to the victims of the Algiers interrogations and raids. One of the seven indicted officers, Stephen Reboul, had been the subject of at least eleven complaints of serious misconduct prior to 1980, including brutality and use of excessive force, and was the subject of five separate civil suits against the City of New Orleans that resulted in payouts to claimants of $814,000.[12] Nevertheless, Officer Reboul had never been disciplined prior to receiving notoriety as a result of his involvement in the Algiers police raid.

158.     After the jury verdict in the Algiers Seven case in 1983, one of the federal prosecutors, Michael Johnson, stated that the verdict "sent a message to New Orleans that they have a problem." Even still, very little changed. An April 1991 study by the United States Department of Justice Civil Rights Division found that the NOPD had the highest average number of complaints of official misconduct to the Federal Bureau of Investigation across the six-year period 1985 through 1990. From 1985 through 1990, New Orleans averaged 26 civil rights complaints for every 1,000 officers, 52 times the rate for New York City, which averaged 0.5 complaints for every 1,000 officers. The NOPD continued to fail to institute robust disciplinary processes to control police officer behavior, a failure that continued to reinforce the "code of silence." For example, a 1993 Mayor's Report on Police Use of Force found that the NOPD Internal Affairs Division required that allegations against an officer be proved "beyond a reasonable doubt," rather than the typical "preponderance of the evidence" standard. Decades prior, a 1971 report by the International Association of Chiefs of Police had advised the NOPD to adopt a standard of "reasonable proof," rather than "proof beyond reasonable doubt."

---

[12] *Reboul v. Dep't of Police*, 420 So. 2d 491 (1982).

Furthermore, a 1991 report on the NOPD by the International Association of Chiefs of Police found that the Internal Affairs Division was understaffed and that it frequently failed to make or keep records of complaints.

159.    History repeated itself in March 1990, when an individual named Adolph Archie was severely beaten in police custody and sustained injuries that proved fatal. Mr. Archie escaped from a work release program and allegedly shot a police officer four times. He was pursued by police, shot in the arm during the pursuit, and arrested. While Mr. Archie was in custody, police officers broadcast threats against him over the police radio. Mr. Archie was transported first to Charity Hospital, then redirected to a district police station. There, he was severely beaten by police officers. Martin Venezia, then a lieutenant, arrived at the district station and was aware that Mr. Archie had been seriously injured. He questioned the officers involved but failed to preserve evidence of the beating, including a bloody carpet and the officers' clothes and shoes. Officers later claimed that Mr. Archie had attacked them while in custody. Mr. Archie was taken to Charity Hospital, where he died. The coroner's office ultimately deemed his death a "homicide, police intervention." Even so, the Internal Affairs Division conducted no investigation into the death, and, on information and belief, no officers were disciplined for the threats, beatings, failure to preserve evidence, and other misconduct.

160.    Despite the longstanding and widespread unconstitutional NOPD customs, policies, and practices during the time of Mr. Floyd's arrest and conviction, the above mentioned misconduct continued within the NOPD for over 30 years. In 2011, the United States Department of Justice ("DOJ") released an investigative report regarding the City of New Orleans and the NOPD, finding that "[a] number of longstanding and entrenched practices cause or contribute to the patterns or practices of unconstitutional and discriminatory conduct we observed. The

Department's failure to provide sufficient guidance, training, and support to its officers, as well as its failure to implement systems to ensure officers are wielding their authority effectively and safely, have created an environment that permits and promotes constitutional harm." The DOJ's report found that "NOPD's custodial interrogation practices reflect many of the same problems we found throughout NOPD: inadequate policies, poor or non-existent training, weak supervision and accountability, and inadequate facilities and equipment" and that the NOPD fails to conduct full and complete interrogations as they have a "desire to avoid discovering exculpatory information during the interrogation that would interfere with the arrest or prosecution of the suspect." Ultimately, the DOJ concluded that the "NOPD engages in a pattern or practice of discriminatory policing in violation of constitutional and statutory law," that officers in the NOPD "misrepresented witness statements in their investigative report," and that "in [the NOPD's] eagerness to obtain the evidence needed to make a case, or sometimes due to a simple lack of knowledge about what the law permits or how to protect their cases, detectives may use methods that run afoul of the Constitution – running the risk that the wrong person will be prosecuted…"

161.    By the time of Mr. Floyd's arrest and prosecution, it was clear to NOPD, including its policymakers, that this pervasive "code of silence" would lead officers to engage in unlawful and unconstitutional conduct—as it did in the case of Mr. Floyd. Nevertheless, the NOPD failed to take minimally necessary action to remedy this rampant culture of both engaging in police misconduct and affirmatively shielding fellow officers from any accountability for their own misconduct. As a predictable result of those failures to act, Defendants engaged in the misconduct in Mr. Floyd's investigation outlined above, and Mr. Floyd was wrongly convicted after an unconstitutional trial.

**The DA's Office maintained unconstitutional policies and practices regarding *Brady* material.**

162.    The failure to disclose exculpatory evidence in Mr. Floyd's case was also a result of the customs, policies and procedures of the DA's Office at the time. In particular, the office maintained a type of "don't ask, don't tell" policy of failing to seek out any exculpatory information that was not affirmatively provided to them by the NOPD. This custom, policy and practice was a direct result of the hostility to *Brady* obligations encouraged by the then final policymaker, former District Attorney Harry Connick.

163.    A limited pre-Complaint investigation has identified numerous similar violations as well as other relevant evidence indicating that the DA's Office — as a matter of custom, practice, and policy — encouraged prosecutors to avoid *Brady* obligations wherever possible.

164.    Former District Attorney Harry Connick, who was at all relevant times the chief policymaker in the DA's Office, espoused a fundamentally incorrect and unconstitutional interpretation of *Brady's* requirements. Mr. Connick has previously testified that *Brady* only requires production of evidence that "exculpates the accused," as opposed to evidence merely "favorable" to the defense.[13] According to Mr. Connick, there could be no *Brady* violation arising out of "inadvertent conduct of [an] assistant under pressure with a lot of case load."[14]

165.    The DA's Office exacerbated the unconstitutional policy by imposing severe penalties for ADA's who provided evidence that did not qualify as *Brady* information in Mr. Connick's overly restrictive interpretation. According to former ADA's in his office, Mr. Connick espoused a "convict at all cost attitude," and an ADA could have been terminated for giving up such evidence.

---

[13] *Connick v. Thompson*, 563 U.S. 51 (2011).

[14] *Id.* at 94.

166.     In the DA's Office, there was no open file discovery; that is, every discovery request was within the discretion of the ADA. Moreover, ADAs faced significant pressure because Mr. Connick expected that any case that was screened and accepted should result in a conviction. This policy created "animosity" among the ADAs in the DA's Office. Moreover, whenever an ADA failed to get a conviction, Mr. Connick or another supervisor would talk with the ADA about why the case was lost.

167.     Mr. Connick resisted efforts to hold his prosecutors accountable for *Brady* compliance because it would "make [his] job more difficult[.]"[15] Mr. Connick has testified that during his tenure, he never disciplined or fired a single prosecutor for violating *Brady*.[16] Mr. Connick recognized that the DA's Office lost four cases before the Louisiana Supreme Court by 1985, including *State v. Carney*, 334 So. 2d 415, 419 (La. 1976), in which the court found that the DA's Office had committed *Brady* violations.[17] Even following the aforementioned capital case *Kyles v. Whitley*, 514 U.S. 419 (1995), in which the Supreme Court reversed based on the DA's Office's failure to disclose favorable evidence to the defense, Mr. Connick stated that he was satisfied with the DA's Office's practices and saw no need for any changes."[18]

168.     Specifically, Supervising ADAs instructed interns and other ADAs to write "not entitled" in response to discovery requests for *Brady* material. Former ADAs have explained that the DA's Office's unwritten policies on *Brady* material were to be "as restrictive as possible" and "when in doubt, don't give it up." Also, ADAs have stated that the DA's Office's alternative

---

[15] *Id.* at 100.

[16] *Id.* at 105, n.20.

[17] *Id.* at 99, n. 16

[18] *Id.* at 100.

was to "deny the *Brady* request as 'not entitled' and effectively pass the buck to the judge if indeed the criminal defendant pursued the information."

169.    In addition, ADAs in Mr. Connick's office were trained that as long as they did not possess witness statements to the police, they did not have a duty to contact the police or produce police reports reflecting statements of the State's witnesses. Former ADAs explained that they did not believe that they had any affirmative duty to search from criminal histories or rap sheets of the State's witnesses under their *Brady* obligations. Therefore, they did not have to produce those documents even if they included exculpatory evidence.

170.    As a result of the custom, policy, and practice of avoiding possession of *Brady* material to prevent having to disclose it to the defense, prosecutors would not customarily contact the Latent Print Unit to ask about fingerprint exclusions, even though it was well known in the DA's Office that the Latent Print Unit only created written reports when they "matched" a print, and did not create any written report when either the comparison of the prints excluded the suspect or when the prints were not suitable for comparison or the result of the comparison was inconclusive. Similarly, prosecutors would not customarily contact NOPD detectives to seek out any information not affirmatively provided in the Detective's written report provided to the prosecutor. Thus, for example, prosecutors would not customarily obtain any witness statements taken during the investigation (such as, here, any written statement taken from John Rue Clegg) or any other daily activity report created by the investigating officers during the investigation, but would instead rely on the final written report typically created only after an arrest.

171.    Despite repeated problems and consistent recognition within and outside of the DA's Office, the hostility to comply with *Brady* obligations was the cause of numerous

unconstitutional *Brady* violations.[19] The DA's Office maintained these same customs and

practices, including the "don't ask, don't tell" policy that caused the constitutional *Brady*

violations in Mr. Floyd's case.

172.     As a result of these customs, policies, and practices, the prosecutors in this case

never learned of critical exculpatory evidence, including the fingerprint exclusions and Clegg's

exculpatory statement about Hines's preferences, and therefore could not disclose that

exculpatory information to the defense or the court.

## DAMAGES

173.     Defendants' actions deprived Plaintiff JD ("John") Floyd of his civil rights under

the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as

the constitution and statutes of the state of Louisiana.

174.     This action seeks damages for the period from January 19, 1981, through each

and every year to the present. Defendants' unlawful, intentional, willful, deliberately indifferent,

reckless, and negligent acts and omissions caused Mr. Floyd to be wrongly seized, wrongfully

convicted, falsely imprisoned, and forced to serve decades of prison time for crimes he did not

commit.

175.     Defendants' unlawful, intentional, willful, deliberately indifferent, and reckless

acts and omissions caused Mr. Floyd the following injuries and damages, which were

foreseeable to Defendants at the time of their acts and omissions: physical injuries; pain and

suffering; severe mental anguish; emotional distress; loss of family relationships; severe

---

[19] *See e.g. Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1979); *Truvia v. Connick*, 577 F. App'x 317 (5th Cir. 2014); *State v. Carney*, 334 So. 2d 415 (La. 1976); *State v. Falkins*, 356 So. 2d 415 (La. 1978); *State v. Curtis*, 384 So. 2d 396 (La. 1980); *State v. Perkins*, 423 So. 2d 1103 (La. 1982); *State v. Rosiere*, 488 So. 2d 965 (La. 1986); *State v. Lindsey*, 844 So. 2d 961 (La. Ct. App. 2003); *State v. Smith*, 591 So. 2d 1219 (La. Ct. App. 1991); *State v. Oliver*, 682 So. 2d 301 (La. Ct. App. 1996); *Smith v. Cain*, 132 S. Ct. 627 (2012); *State v. Bright*, 875 So. 2d 37 (La. 2004); *Mahler v. Kaylo*, 537 F.3d 494 (5th Cir. 2008).

psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

176.      These injuries began in 1981 and will continue into the future. Specifically, Mr. Floyd's liberty was curtailed upon his arrest and jailing on January 19, 1981. He remained incarcerated until June 22, 2017, and was on supervised probation until November 20, 2018.

## FEDERAL CLAIMS

## <u>COUNT I</u>

**JD ("John") Floyd's 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law under the Fourteenth Amendment**

*Against All Individual Defendants*

177.      Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

178.      As described more fully above, Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, improperly fabricated false confessions to the murders of William Hines and Rodney Robinson, which they later coerced Mr. Floyd into signing; fabricated false evidence to support the coerced confessions; suppressed exculpatory evidence that would have contradicted the false confessions, , and instead followed through with the unlawful prosecution of Mr. Floyd, thereby depriving Mr. Floyd of his right not to be deprived of liberty without due process of law.

56

179.    In particular, Defendants Dillmann and Rice, along with Officer Reilly, fabricated separate "confessions" to the Hines and Robinson murders, each of which was created to falsely look like a verbatim record of a Q and A with Mr. Floyd.

180.    Defendants falsely represented to prosecutors that Mr. Floyd's confessions were in fact freely and voluntarily given, and that Mr. Floyd had independent knowledge of non-public details of the crime when those portions of the statements were directly fabricated by Defendants and/or those details had been provided to him by Defendants.

181.    Defendants also fabricated additional evidence to support Mr. Floyd's conviction. In particular, Defendants intentionally and in bad faith coerced and/or fabricated statements from two witnesses—Mr. Edwards and Mr. Reed—that Mr. Floyd made incriminatory statements regarding both murders. Defendants then concealed the misconduct that had produced those statements as well as additional material exculpatory and impeachment evidence, including but not limited to coercive tactics utilized in witness interviews, from prosecutors, defense attorneys, and the court.

182.    Defendants intentionally and in bad faith suppressed an exculpatory statement that they knew would tend to show Mr. Floyd was innocent of the Hines murder. In particular, Defendants suppressed a statement by John Rue Clegg—Mr. Hine's close personal friend—that Mr. Hines had a preference for black male sexual partners. This statement corroborated physical evidence from the crime scene, specifically pubic hairs from an African American man found in Mr. Hines's bed. Defendants not only suppressed this exculpatory statement but also fabricated a police report falsely claiming that Mr. Clegg stated Mr. Hines had no preference between black and white male partners; Defendants further relied on that fabricated statement to downplay the significance of the African-American pubic hairs found in Mr. Hines's bed and explain their

decision to pursue a white suspect. Defendants concealed the exculpatory statement and fabrication from prosecutors, defense attorneys, and the court.

183.     Defendants also intentionally and in bad faith suppressed scientific evidence which they knew would clear Mr. Floyd of any involvement in the crimes. In particular, Defendants suppressed evidence that Mr. Floyd was excluded as the source of the fingerprints lifted from sensitive locations at the Hines and Robinson murder scene and the existence of unidentified fingerprints that did not belong to Mr. Floyd or the victim. Prior to Mr. Floyd's arrest, Defendants had relied on fingerprint evidence to rule out at least one potential suspect. After arresting Mr. Floyd, Defendants confirmed Mr. Floyd did not match the blood or fingerprints and yet continued with their unconstitutional prosecution—including coercing and/or fabricating from Mr. Reed another alleged inculpatory statement by Mr. Floyd regarding the Robinson murder. Defendants' actions severely prejudiced Mr. Floyd at trial, violated his due process rights, and directly resulted in his wrongful conviction and incarceration.

184.     Had Defendants' fabrications and/or the material exculpatory and impeachment evidence known to them been disclosed, this evidence would have tended to prove Mr. Floyd's innocence and cast doubt on the entire police investigation and prosecution.

185.     Defendants' misconduct did not cease with Mr. Floyd's conviction, but continued through his exoneration, thereby prolonging his wrongful incarceration.

186.     Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1981 would have believed that Defendants' actions were lawful.

187.     As a direct and proximate result of Defendants' actions, Mr. Floyd was wrongly prosecuted, detained, and incarcerated for more than thirty-six years and suffered the other grievous injuries and damages set forth above.

## COUNT II

### JD ("John") Floyd's 42 U.S.C. § 1983 Claim for Violation of His Fifth and Fourteenth Amendment Right Against Self-Incrimination

*Against Defendants Dillmann and Rice*

188.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

189.     Defendants Dillmann and Rice, individually and in concert, improperly coerced Mr. Floyd to adopt the fabricated confessions to the murders of William Hines and Rodney Robinson, and used these coerced statements against Mr. Floyd in his criminal case, thereby violating Mr. Floyd's Fifth and Fourteenth Amendment protection against self-incrimination.

190.     Defendants, individually and in concert, took Mr. Floyd into custody ostensibly based on one innocuous statement made about the Robinson murder and one vague, drunken boast made about the Hines murder. Defendants ignored clear evidence that these murders were committed by an African-American man, not the white Mr. Floyd, and knowledge that they had in fact coerced and/or fabricated his allegedly incriminating statement. Rather than investigate likely suspects, Defendants intentionally and in bad faith set about to violate Mr. Floyd's due process rights.

191.     Understanding Mr. Floyd's mental state, including his high level of intoxication, and susceptibility to false confessions, Defendants Dillmann and Rice, along with Reilly, coerced Mr. Floyd, through direct and indirect means, to involuntarily sign false and fabricated statements implicating himself in the murders of Mr. Hines and Mr. Robinson.

192.    The interrogation techniques used against Mr. Floyd were unconstitutionally coercive based on the totality of the circumstances. Defendants had reason to know that Mr. Floyd was cognitively impaired and extremely intoxicated, in particular because Defendants purchased alcoholic drinks for Mr. Floyd before taking him into custody, and because Mr. Floyd told them he had been drinking since that morning and taken narcotics. Nevertheless, Defendants interrogated Mr. Floyd for at least 5.5 and up to 10 hours. Defendants physically struck Mr. Floyd and verbally threatened him. Defendants interrogated Mr. Floyd without any friend, relative, or advisor present; ignored Mr. Floyd's protestations of innocence; manipulated and misstated Mr. Floyd's statements; showed Mr. Floyd details photographs of the Hines crime scene; and ultimately fabricated two confessions that they coerced Mr. Floyd into signing.

193.    Mr. Floyd, who was terrified and completely lacked the mental capacity to understand the consequences of waiving his right to remain silent and his right to a criminal trial, made false incriminating statements that were used against him, all as a result of Defendants' coercion and in violation of his Fifth Amendment right to be free from compelled self-incrimination.

194.    When Defendants arrested and interrogated Mr. Floyd, Defendants engaged in fabrication in addition to the coercion described above. Specifically, Defendants fabricated and/or fed the non-public details contained in the confessions to Mr. Floyd. This fabricated evidence made Mr. Floyd's confessions appear to be credible and reliable.

195.    In addition, Defendants deliberately and/or recklessly ignored apparent evidence of Mr. Floyd's innocence, including but not limited to the following: ignoring the statement of eyewitness who saw an African-American man fleeing the Robinson crime scene; ignoring the statement by Mr. Hines's friend Mr. Clegg that Mr. Hines's preferred African-American male

partners; ignoring physical evidence at both crime scene indicating that the perpetrator was an African-American man, including but not limited to pubic hair from an African-American man found in both victims' bed and hair from an African-American man, that did not belong to Mr. Robinson, found in the blood-soaked cap at the Robinson crime scene.

196.    Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officers in 1981 would have believed that Defendants' actions were lawful.

197.    As a direct and proximate result of Defendants' actions, Mr. Floyd was wrongly prosecuted, detained, and incarcerated for more than thirty-six years and suffered other grievous injuries and damages set forth above.

## COUNT III

### JD ("John") Floyd's 42 U.S.C. § 1983 Claim for Unlawful Seizure and Detention Without Probable Cause in Violation of the Fourth Amendment as Incorporated through the Fourteenth Amendment

*Against All Individual Defendants*

198.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

199.    Defendants, despite knowing that probable cause did not exist to arrest, continually detain, and or/prosecute Mr. Floyd for the murders of William Hines and Rodney Robinson, acted individually and in concert to cause Mr. Floyd to be arrested, continually detained, and prosecuted for those crimes. Defendants' conducted violated Mr. Floyd's rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused his wrongful detention.

200.    Defendants also deliberately and/or recklessly ignored apparent evidence pointing to other suspects and corroborating Mr. Floyd's innocence, and/or covered up or failed to

investigate such evidence, including but not limited to the following: the fact that Mr. Floyd's fingerprints were excluded as the source of fingerprints at sensitive locations in the Hines and Robinson murder scenes; that Mr. Floyd was excluded as the source of the semen found in Mr. Robinson; that Mr. Floyd was excluded as the source of any blood found at either crime scene; that the pubic and head hairs found at both crime scenes came from an African-American man and therefore could not have come from Mr. Floyd, who is white; that the sole eyewitness to give a suspect description described an African-American man fleeing the Robinson crime scene immediately after the murder; that Mr. Hines's friend told Defendants that Mr. Hines's preferred black male sexual partners as he had only seen him with black men; and Mr. Floyd's repeated protestations of innocence. Defendants' deliberate and/or reckless failure to investigate exculpatory evidence that was known to them, or, in the absence of their deliberate and/or reckless indifference, should have been known to them, caused Mr. Floyd to be deprived of his rights under the Fourteenth Amendment.

201.     The above-described acts were shocking, and were performed by Defendants deliberately, with reckless disregard for the truth, and with malice.

202.     In fact, Mr. Floyd was innocent of the murder of William Hines (and innocent of the murder or Rodney Robinson as well), and was exonerated in 2018, thirty-six years after his wrongful conviction.

203.     Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1981 would have believed that Defendants' actions were lawful.

204.     As a direct and proximate result of Defendants' actions, Mr. Floyd was wrongly detained and prosecuted up until the time of his conviction and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IV

### JD ("John") Floyd's 42 U.S.C. § 1983 Failure to Intervene Claim

*Against All Individual Defendants*

205.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

206.     By their conduct and under color of law, during the constitutional violations described herein, Defendants stood by without intervening to prevent other Defendants and others yet unknown from violating Mr. Floyd's constitutional rights, even though those Defendants had the opportunity to so intervene.

207.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Floyd's clearly established constitutional rights.

208.     Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1981 would have believed Defendants' actions were lawful.

209.     As a direct and proximate result of Defendants' actions, Mr. Floyd was wrongly prosecuted, detained, and incarcerated for thirty-six years and suffered the other grievous injuries and damages set forth above.

## COUNT V

**JD ("John") Floyd's 42 U.S.C. § 1983 Civil Rights Conspiracy Claim**

*Against All Individual Defendants*

210.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

211.    Defendants Dillmann, Rice, John Doe Latent Print Unit analyst, and others yet unknown agreed among themselves and other individuals, including Officer Reilly, Detective Fred Dantagnan, Sergeant Paul Drouant, Detective Martin Venezia, and other NOPD officers and investigators, to act in concert to deprive Mr. Floyd of his clearly established rights not to be compelled as a witness against himself, not to be deprived of liberty without due process of law, and not to be illegally seized and detained.

212.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including but not limited to the following:

> (a) Defendants acted in concert to obtain Mr. Floyd's confessions through physical abuse, threats, and other means deliberately designed to exploit Mr. Floyd's obvious intellectual, emotional, and economic vulnerabilities.
>
> (b) Defendants supplied Mr. Floyd with non-public facts known to them and through coercion, deception, and trickery compelled Mr. Floyd to adopt these facts as his own by incorporating them into his fabricated confessions, which they forced Mr. Floyd to sign.
>
> (c) Defendants acted in concert to coerce and fabricate a statement from Stephen Edwards to falsely provide a basis to take Mr. Floyd into custody, then hid that misconduct from defense counsel and prosecutors.
>
> (d) Defendants acted in concert to coerce and/or fabricate statements from Byron Gene Reed to inculpate Mr. Floyd in the Robinson murder.
>
> (e) Defendants acted in concert to conceal exculpatory evidence that tended to show Mr. Floyd's innocence, including but not limited to bodily fluid and fingerprint evidence and witness statements excluding Mr. Floyd as the true perpetrator.

(f)  Defendants deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Mr. Floyd's innocence.

213.     As a direct and proximate result of Defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Floyd was wrongly prosecuted, detained, and incarcerated for thirty-six years and suffered the other grievous injuries and damages set forth above.

## COUNT VI

### JD ("John") Floyd's 42 U.S.C. § 1983 Claim for Supervisory Liability

*Against Defendants London and John Doe Supervisors*

214.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

215.     Defendants London and John Doe Supervisors were personally and directly involved in the case against Mr. Floyd and knew, or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Mr. Floyd of his clearly established constitutional rights through misconduct that included but was not limited to coercing and fabricating confessions from Mr. Floyd; beating and threatening Mr. Floyd; deliberately ignoring evidence of Mr. Floyd's innocence; and violating Defendants' ongoing affirmative obligation to come forward with evidence of innocence and the truth of their own misconduct.

216.     The supervisor Defendants, by deliberately and/or recklessly failing to supervise their subordinate officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Mr. Floyd of his clearly established constitutional rights, including but not limited to their rights not to be compelled to be witnesses against themselves, to be free from unreasonable searches and seizures, and not to be deprived of liberty without due process of law.

217.     Moreover, the supervisor Defendants allowed their subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and in which those subordinates knew that their violations of Mr. Floyd's constitutional rights would be facilitated, approved, and/or condoned by the supervisory Defendants.

218.     The supervisory Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1981 would have believed that the supervisory Defendants' actions were lawful.

219.     As a direct and proximate result of the supervisory Defendants' actions, Mr. Floyd was wrongly prosecuted, convicted, and imprisoned for thirty-six years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT VII

**JD ("John") Floyd's 42 U.S.C. § 1983 *Monell* Claim against the NOPD**

*Against the City of New Orleans*

220.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

***Suppression of Exculpatory Evidence***

221.     The NOPD investigated Mr. Floyd for the murders of William Hines and Rodney Robinson, but failed to disclose critical exculpatory evidence to Mr. Floyd and his defense team or the prosecution before, during, or after the murder trial. The concealed exculpatory evidence was material, and the failure to turn over this evidence violated Mr. Floyd's constitutional rights.

222.     The suppressed evidentiary materials were exculpatory as to Mr. Floyd's responsibility for the murder of Hines and Robinson because they were material to Mr. Floyd's innocence, and would have directly contradicted the confessions that underlay the State's case and pointed to other suspects unrelated to Mr. Floyd.

223.     Mr. Floyd's conviction was eventually vacated based on the State's unconstitutional suppression of exculpatory evidence in violation of *Brady*.

224.     The NOPD demonstrated deliberate indifference to Mr. Floyd's constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of the DA's Office regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees of the DA's Office had failed to comply with the obligations of *Brady*.

225.     This failure to establish adequate constitutional procedures and policies is further supported by Detective Dillmann's own admissions that at all times relevant hereto, there was no formal NOPD training or supervision on avoiding and/or preventing NOPD officers from fabricating evidence, coercing confessions, interrogating suspects, or disclosing favorable or exculpatory evidence.

226.     The NOPD, acting in its final policymaking authority and under color of law, demonstrated deliberate indifference to Mr. Floyd's constitutional rights by adopting and maintaining constitutionally deficient policies with respect to discharging its *Brady* obligations, including failing to adequately train, monitor, and supervise the employees of the NOPD regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obvious need for such training, monitoring or supervision given their awareness of numerous prior incidents in which the NOPD had failed to comply with the obligations of *Brady*.

227.    The general practice of withholding exculpatory evidence and failing to appropriately train was so common and well established as to constitute official policy that fairly represented the NOPD's official custom, policy, and/or practice.

228.    The NOPD's actions and the official policy, practice, and/or custom resulted directly in the constitutionally deficient investigation and prosecution of Mr. Floyd and violated his rights under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and 42 U.S.C. § 1983.

229.    The official policy, practice, and/or custom of concealing exculpatory evidence proximately and directly caused Mr. Floyd's injuries, including spending over thirty-six years in prison for a murder he did not commit as well as the other injuries stated herein.

230.    The City of New Orleans is liable to Mr. Floyd pursuant to 42 U.S.C. § 1983.

***Coercion of Involuntary Confessions***

231.    While investigating Mr. Floyd for the murders of Hines and Robinson, the NOPD obtained a confession from Mr. Floyd through coercive means. This involuntary confession was a critical component of the State's case against Mr. Floyd at trial. The taking and introduction of this coerced and involuntary confession at Mr. Floyd's trial violated Mr. Floyd's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

232.    Mr. Floyd's conviction was eventually vacated.

233.    The NOPD demonstrated deliberate indifference to Mr. Floyd's constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of the NOPD regarding the constitutional prohibition on coerced and involuntary confessions, despite the obviousness that such training, monitoring or supervision

was required to prevent constitutional violations, and their awareness of prior incidents in which employees of the NOPD had failed to comply with such constitutional prohibition.

234.    The NOPD, acting in its final policymaking authority and under color of law, demonstrated deliberate indifference to Mr. Floyd's constitutional rights by adopting and maintaining constitutionally deficient policies with respect to discharging the NOPD's constitutional obligation to refrain from coercing involuntary confessions, including failing to adequately train, monitor, and supervise the employees of the NOPD regarding such constitutional duty, despite the obvious need for such training, monitoring or supervision given their awareness of numerous prior incidents in which employees of the NOPD had failed to comply with such constitutional obligations.

235.    The general practice of coercing involuntary confessions was so common and well established as to constitute official policy that fairly represented the NOPD's official custom, policy, and/or practice.

236.    The official policy, practice, and/or custom of coercing involuntary confessions proximately and directly caused Mr. Floyd's injuries, including spending over thirty-six years in prison for a murder he did not commit as well as the other injuries stated herein.

237.    The City of New Orleans is liable to Mr. Floyd pursuant to 42 U.S.C. § 1983.

*The "Code of Silence" and Police Misconduct*

238.    A "code of silence" existed at the NOPD at all time periods relevant to Mr. Floyd's claims.

239.    This "code of silence" constituted a widespread, prevalent custom or practice in which officers shielded fellow officers after they committed illegal acts, including constitutional

violations. This custom or practice was so common and well established that it fairly represented the NOPD's official custom, policy, and/or practice.

240.    NOPD policymakers had actual or constructive knowledge of the existence of a "code of silence" at the NOPD.

241.    The NOPD policymakers demonstrated objective deliberate indifference to the known or obvious consequences of the "code of silence," including that the "code of silence" would and did cause constitutional violations.

242.    The official policy, practice, and/or custom of a "code of silence" proximately and directly caused Mr. Floyd's injuries, including spending over thirty-six years in prison for a murder he did not commit as well as other injuries stated herein. It did so by causing officers to withhold exculpatory evidence—evidence which would have implicated an African American male with Type-A blood in both William Hines and Rodney Robinson's murders—and to manufacture evidence against Mr. Floyd.

243.    The City of New Orleans is liable to Mr. Floyd pursuant to 42 U.S.C. § 1983.

## COUNT VIII

**JD ("John") Floyd's 42 U.S.C. § 1983 *Monell* Claim against the DA's Office[20]**

*Against Leon Cannizzaro, Jr., in his official capacity as District Attorney of Orleans Parish*

244.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

245.    The DA's Office charged or indicted Mr. Floyd with the murders of William Hines and Rodney Robinson.

---

[20] Former District Attorney Harry Connick was the policymaker of the DA's Office during the relevant time period, and all of the unconstitutional conduct described in Mr. Floyd's Complaint took place during Mr. Connick's tenure as District Attorney. Mr. Floyd has named Defendant Cannizzaro, the current Orleans Parish District Attorney, in his official capacity only, and not based on any conduct by Mr. Cannizzaro personally.

246.     The DA's Office failed to disclose critical exculpatory evidence to Mr. Floyd before, during, or after the murder trial. The concealed exculpatory evidence was material, and the failure to turn over this evidence gave rise to violations of Mr. Floyd's constitutional rights under *Brady*.

247.     The suppressed evidentiary materials were exculpatory and material to Mr. Floyd's innocence, and would have directly contradicted the confessions that underlay the State's case by pointing to other suspects unrelated to Mr. Floyd.

248.     Mr. Floyd's conviction was eventually vacated when the Fifth Circuit found a *Brady* violation based on the suppression of exonerating fingerprint evidence and John Clegg's statement regarding Hine's sexual preference for black men. These *Brady* violations were caused by the "don't ask don't tell" policy and culture of the DA's office who encouraged nondisclosure where feasible, as described in the facts alleged above.

249.     The actions of the DA's Office violated Mr. Floyd's right to due process and a fair trial under the United States Constitution and 42 U.S.C. § 1983.

250.     The DA's Office maintained policies and procedures that were based on a fundamental and unconstitutional misinterpretation of the prosecutor's obligations under *Brady*.

251.     The DA's Office demonstrated deliberate indifference to Mr. Floyd's constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of the DA's Office regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring, or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees of the DA's Office had failed to comply with the obligations of *Brady*.

252.    The DA's Office, under color of law, demonstrated deliberate indifference to Mr. Adams's constitutional rights by adopting and maintaining constitutionally deficient policies with respect to discharging the DA's Office's *Brady* obligations, including failing to adequately train, monitor, and supervise employees regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obvious need for such training, monitoring, and supervision given their awareness of numerous prior incidents in which employees of the DA's Office had failed to comply with the obligations of *Brady*.

253.    The general practice of withholding exculpatory evidence and failing to appropriately train was so common and well established as to constitute official policy that fairly represented the DA's Office's official custom, policy, and/or practice. This general practice and policy persisted through the time of Mr. Floyd's release in 2017.

254.    The official policy, practice, and/or custom of the DA's Office resulted directly in the constitutionally deficient investigation and prosecution of Mr. Floyd and violated his rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and 42 U.S.C. § 1983.

255.    The official policy, practice, and/or custom of concealing exculpatory evidence and maliciously prosecuting individuals, without regard to guilt or innocence, proximately and directly caused Mr. Floyd's injuries, including spending over thirty-six years in prison for a murder he did not commit as well as the other injuries stated herein.

256.    Defendant Cannizzaro, as the representative of the DA's Office, is liable to Mr. Floyd pursuant to 42 U.S.C. § 1983.

## COUNT IX

**JD ("John") Floyd's 42 U.S.C. § 1983 Claim for Violation of Title II of the Americans with Disabilities Act**

*Against the City of New Orleans*

257.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

258.     Plaintiff suffers from one or more disabilities—including borderline intellectual functioning—that substantially limits one or more of his major life activities, including without limitation: caring for himself, thinking, working, communicating, learning, and sleeping. In addition, Defendant is regarded as suffering from one or more qualifying disabilities.

259.     The individual Defendants coerced false confessions from Mr. Floyd, conducted the unlawfully flawed investigation, and arrested Mr. Floyd all while employed by the New Orleans Police Department, a subdivision of the City of New Orleans. Arrests and investigations are services, programs, or activities of a city's police department that are covered by the Americans with Disabilities Act.

260.     With knowledge of Mr. Floyd's serious mental disabilities and/or regarding Mr. Floyd as seriously disabled, the individual Defendants discriminated against him by reason of that disability. The City by and through its agents intentionally, or with deliberate indifference, exploited Mr. Floyd's mental illness by, among other things, failing to investigate his alibi and other evidence of his innocence, and conducting and relying exclusively on suggestive identification procedures. Defendants engaged in misconduct in whole or in part because they thought they could get away with that misconduct as a result of Mr. Floyd's disabilities.

261.     As a direct and proximate result of the City of New Orleans' actions, Mr. Floyd was wrongly prosecuted, detained, and incarcerated for twenty years and suffered the other grievous injuries and damages set forth above.

## STATE LAW CLAIMS

## COUNT X

### JD ("John") Floyd's Claim for Malicious Prosecution

*Against All Individual Defendants*

262.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

263.     Defendants, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously and without probable cause or legal justification, cause Mr. Floyd to be prosecuted, detained, and incarcerated for the murder of William Hines.

264.     Defendants engaged in this conduct without concern for or consideration of the perceived guilt or innocence of Mr. Floyd, and for no purpose related to any legitimate prosecutorial concerns.

265.     Defendant Latent Print Unit Analyst John Doe(s) analyzed Mr. Floyd's fingerprints in comparison to the prints lifted from sensitive locations from both crime scenes and, in conjunction with Defendants Dillmann and Rice did not report the exculpatory results of that testing.

266.     Mr. Floyd is, and has consistently maintained that he is, innocent of the murders of Mr. Hines and Mr. Robinson. His conviction has been found invalid by the United States Court of Appeals for the Fifth Circuit, and the charges against him have been dismissed in their entirety.

267.     As a direct and proximate result of Defendants' malicious prosecution, Mr. Floyd was wrongfully detained and incarcerated and served over thirty-six years for crimes he did not commit, and suffered the additional physical, emotional and pecuniary damages as described above.

## COUNT XI

### JD ("John") Floyd's Claim for Wrongful Conviction and Wrongful Imprisonment

*Against All Individual Defendants*

268.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

269.     Defendants acting separately and in concert, individually and in their official capacity did willfully, unlawfully, and maliciously and without probable cause or legal justification, cause Mr. Floyd to be arrested, prosecuted, and incarcerated for an ongoing and continuing basis lasting over thirty-six years for a crime he did not commit.

270.     Defendants intentionally, maliciously and with reckless disregard for and deliberate indifference to his rights, coerced his confessions, fabricated false evidence, withheld exculpatory evidence, and presented false arguments and false facts to the court for the purpose of ensuring that Mr. Floyd was arrested, prosecuted, and incarcerated and to preclude judicial authorities from discovering the lack of probable cause for the prosecution and ongoing detention of Mr. Floyd.

271.     As a direct and proximate result of Defendants' wrongful imprisonment, Mr. Floyd suffered the physical, emotional and pecuniary damages as described above.

## COUNT XII

### JD ("John") Floyd's Claim for Negligence and/or Gross Negligence

*Against All Individual Defendants*

272.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

273.     The individual Defendants in this case failed to take due care, and instead were negligent and/or grossly negligent in investigating the murders of William Hines and Rodney Robinson, reporting false evidence against Mr. Floyd, and withholding exculpatory evidence from him.

274.     It was foreseeable that, as a result of the individual Defendants' negligence, Mr. Floyd would be wrongfully detained and incarcerated, and in fact, Mr. Floyd was wrongfully detained and incarcerated and served over thirty-six years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described above.

## COUNT XIII

### JD ("John") Floyd's Claim for Negligent and/or Gross Negligent Supervision

*Against All Supervisory Defendants*

275.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

276.     Upon information and belief, Defendants London and other John Doe supervisors of the individual Defendants in this case, acting in their individual capacities, failed to take due care in supervising the investigative practices of the individual Defendants.

277.     It was foreseeable that, as a result of the individual Defendants' negligence, Mr. Floyd would be wrongfully detained and incarcerated, and in fact, Mr. Floyd was wrongfully

detained and incarcerated and served over thirty-six years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described above.

## COUNT XIV

**JD ("John") Floyd's Claim for Intentional and/or Reckless Infliction of Emotional Distress**

*Against All Individual Defendants*

278.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

279.    Defendants, acting separately and in concert individually and in their official capacities, did intentionally, maliciously and with reckless disregard and deliberate indifference to Mr. Floyd's rights engage in extreme and outrageous conduct in connection with the arrest and prosecution of Mr. Floyd including, without limitation, coercing two false confessions from Mr. Floyd; engaging in an deficient investigation; arresting and prosecuting Mr. Floyd without probable cause; fabricating false evidence; withholding exculpatory evidence; and presenting false argument and false facts to the court for the purpose of ensuring that Mr. Floyd was arrested, indicted, detained, and incarcerated.

280.    Defendants desired to inflict severe emotional distress on Mr. Floyd or knew that severe emotional distress would be certain or substantially certain to result from their joint and several conduct.

281.    As a direct and proximate result of Defendants joint and several extreme and outrageous behavior, Mr. Floyd suffered severe emotional distress for which he is entitled to damages.

## COUNT XV

### JD ("John") Floyd's Claim for Violations of the Louisiana Public Records Act, La. Stat. Ann. § 44

*Against Defendant Dillmann and the City of New Orleans*

282.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

283.     The Louisiana Public Records Act guarantees the public's right of access to public records. La. Stat. Ann. § 44:1, *et seq.*  The Public Records Act allows defendants full access to police reports as public records for purposes of postconviction relief.  *Innocence Project New Orleans v. New Orleans Police Dept.*, 129 So. 3d 668 (La. App. 4th Cir. 2013). These rights are also protected by Article 12, section 3 of the Louisiana Constitution which provides that "no person shall be denied the right to observe the deliberations of public bodies and examine public documents except in cases established by law."

284.     In support of postconviction relief, the Innocence Project, on behalf of Mr. Floyd, made several requests for documentation and files from the NOPD concerning its investigations into the Hines and Robinson homicides under the Public Records Law.

285.     The NOPD failed to respond to these public record requests and did not provide Mr. Floyd the Hines and Robinson murder files, which were later found to be missing from the NOPD's homicide storage area in 2008.  There were no records of what files had been taken out of the storage area, but Detective Dillmann later admitted that he took the files to his Louisiana home.  Dillmann told the Innocence Project of New Orleans that he took the NOPD files to write his book *Blood Warning: The True Story of the New Orleans Slasher* (published in 1989) but that the house he stored them in and the files therein had been destroyed in Hurricane Katrina—16 years after the book was published.

286.     Dillmann had a duty to preserve these public records but unlawfully took them from the public for his private financial gain and caused them to be destroyed.  The NOPD had a duty to preserve these public records but unlawfully allowed or failed to prevent Detective Dillmann from wrongfully taking them for his private financial gain and causing them to be destroyed.

287.     Defendants' violations of the Louisiana Constitution and Louisiana Public Records Act actually and proximately caused Mr. Floyd to sustain damages, including to sustain continued wrongful imprisonment.  With the destruction of these records, Mr. Floyd was unable to succeed in his postconviction proceedings at an earlier point in time and to secure his release from prison, which caused the additional physical, emotional and pecuniary damages as described above.

288.     Consequently, the Defendants are liable under La. Stat. Ann. § 44:1 *et seq.* for actual damages, civil penalties, and attorney fees and costs as permitted therein.

## COUNT XVI

### JD ("John") Floyd's Claim for Vicarious Liability

*Against the City of New Orleans*

289.     Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

290.     At all times the individual Defendants were acting within the scope of their employment and as agents for the City of New Orleans.

291.     Consequently, the City of New Orleans is liable under the doctrine of respondeat superior for any and all tortious actions of its employees and agents.

## COUNT XVII

### JD ("John") Floyd's Claim for Violations of the Louisiana State Constitution

*Against the City of New Orleans*

292.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

293.    The Louisiana State Constitution, like the United States Constitution, guarantees a person's right to be secure in his person and effect from unreasonable seizure, to equal protection of the law, to due process of law, to be free from discrimination, to be free from cruel, excessive or unusual punishment, to examine public records, and to additional unenumerated rights. See La. Cost. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, and 24.

294.    By reason of the same intentional, malicious, reckless and deliberate conduct that violated Mr. Floyd's rights under the United States Constitution, Defendants' conduct violated the rights guaranteed plaintiff under Article I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, and 24 of the Louisiana State Constitution.

295.    These violations of the Louisiana State Constitution proximately and directly caused Mr. Floyd to be wrongfully detained and incarcerated at the Louisiana State Penitentiary for a crime he did not commit, and suffer the additional physical, emotional and pecuniary damages as described above.

### PRAYER FOR RELIEF

Mr. Floyd demands a jury trial and respectfully requests that this Court enter judgment against all Defendants on all counts of this Amended Complaint: (a) awarding Mr. Floyd compensatory and punitive damages in amounts to be determined at trial; (b) awarding Mr. Floyd costs and reasonable attorneys' fees in this action pursuant to 42 U.S.C. § 1988; and (c) granting such other and further relief as this Court deems just and proper.

Dated: April 4, 2019

Respectfully submitted,

/s_____
John N. Adcock, T.A.
La. Bar No. 30372
3110 Canal Street
New Orleans, LA 70119
Telephone (504) 233-3125
jnadcock@gmail.com

_____
Nick Brustin*
nick@nsbcivilrights.com
Anna Benvenutti Hoffmann*
anna@nsbcivilrights.com
Katie McCarthy*
katie@nsbcivilrights.com
Neufeld Scheck & Brustin, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
Telephone: (212) 965-9081

_____

William Beck*
wbeck@lathropgage.com
Michael J. Abrams*
mabrams@lathropgage.com
Alexander T. Brown*
abrown@lathropgage.com
Alana McMullin*
amcmullin@lathropgage.com
Lathrop Gage LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
Telephone: (816) 460-5811

Attorneys for Plaintiff

Applications for admission *pro hac vice*
forthcoming