# **EXHIBIT 8**

The Deposition of

# JOHN P. DILLMANN, III

In the Matter of

# JD "John" FLOYD

VERSUS

# DETECTIVE JOHN DILLMANN, ET AL

Taken On

# MARCH 14, 2022



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NO. 19-cv-8769

SECTION H, DIVISION 3

JUDGE JANE TRICHE MILAZZO

MAGISTRATE DANA H. DOUGLAS


JD ("John") FLOYD, Plaintiff

VERSUS

DETECTIVE JOHN DILLMANN; DETECTIVE MICHAEL RICE; LIEUTENANT STEPHEN LONDON; THE CITY OF NEW ORLEANS; LEON CANNIZZARO, JR., in his official capacity; and JOHN DOE DEFENDANTS, Defendants.

* * * * * * * * * * * * * * * *


Videotaped deposition of JOHN P. DILLMANN, III, taken at the offices of GoDepo Court Reporting, Inc., 400 Poydras Street, Suite 900, Riverside Conference Room, New Orleans, Louisiana, 70130, on Monday, March 14th, 2022, at or about 10:23 a.m.

```
 1      APPEARANCES:

 2           NEUFELD, SCHECK & BRUSTIN, LLP
             By:  Emma Freudenberger, Esquire
 3                Grace Paras, Esquire
             99 Hudson Street, Eighth Floor
 4           New York, New York  10013
             212.965.9081
 5           emma@nsbcivilrights.com
             grace@nsbcivilrights.com
 6           (Counsel for Plaintiff)

 7           LATHROP GAGE, LLP
             By:  Michael J. Abrams, Esquire
 8           2345 Grand Boulevard, Suite 2200
             Kansas City, Missouri  64108
 9           816.460.5811
             mabrams@lathropgage.com
10           (Counsel for Plaintiff)

11           LAW OFFICE OF AL. J. ROBERT, JR.
             By:  Al J. Robert, Jr., Esquire
12           757 St. Charles, Suite 301
             New Orleans, Louisiana  70130
13           504.309.4852
             ajr@ajrobert.com
14           (Counsel for Defendant, Detective John
              Dillmann)
15
             LAW OFFICE OF ERIC J. HESSLER
16           By:  Eric J. Hessler, Esquire
             2802 Tulane Avenue
17           New Orleans, Louisiana  70119
             504.301.9913
18           hessler.law@gmail.com
             (Counsel for Defendant, Detective John
19            Dillmann)

20           CITY OF NEW ORLEANS, LAW DEPARTMENT
             By:  Corwin M. St. Raymond, Esquire
21           1300 Perdido Street, Suite 5E03
             New Orleans, Louisiana  70112
22           504.658.9803
             cmstraymond@nola.gov
23           (Counsel for Defendant, City of New
              Orleans)
24
             STANLEY, REUTER, ROSS, THORNTON & ALFORD,
25           LLC
             By:  Matthew J. Paul, Esquire
```

```
 1              909 Poydras Street, Suite 2500
                New Orleans, Louisiana  70112
 2              504.523.1580
                mjp@stanleyreuter.com
 3              (Counsel for Defendant, City of New
                 Orleans, District Attorney Leon
 4               Cannizzaro, Jr., in his official
                 capacity)
 5
                GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
 6              By:  C. Theodore Alpaugh, III, Esquire
                     Claude A. Schlesinger, Esquire
 7              639 Loyola Avenue, Suite 2130
                New Orleans, Louisiana  70113
 8              504.529.4141
                cta@gustebarnett.com
 9              cas@gustebarnett.com
                (Counsel for Defendant, Detective Michael
10               Rice)

11              LAW OFFICE OF PATRICK J. FANNING
                By:  Patrick J. Fanning, Esquire
12              238 Huey P. Long Avenue
                Gretna, Louisiana  70053
13              504.368.7888
                pfanninglaw@aol.com
14              (Counsel for Defendant, Lieutenant Stephen
                 London)
15
        ALSO PRESENT:
16           Mark Ancalade, Videographer
             Katie McCarthy (Via Zoom)
17           Kathryn Haas (Via Zoom)

18      REPORTED BY:
             Gail F. Mason, RPR
19           Certified Court Reporter
             Certificate No. 96004
20

21

22

23

24

25
```

1	Q.	You made many, many representations in
2	"Blood Warning" about conversations you had
3	with Michael Rice, who's sitting here with us
4	today, correct?
5	A.	Upon advice of my counsel, I invoke my
6	5th Amendment Rights.
7	Q.	And you made many representations in
8	"Blood Warning" of conversations you had with
9	Michael Rice during the investigations into the
10	murders of Bill Hines and Rodney Robinson,
11	correct?
12	A.	Upon advice of my counsel, I invoke my
13	5th Amendment Rights.
14	Q.	And all of your representations about
15	conversations you had with Michael Rice while
16	the two of you were investigating the murders
17	of Bill Hines and Rodney Robinson in "Blood
18	Warning" are factually accurate, correct?
19	A.	Upon advice of my counsel, I invoke my
20	5th Amendment Rights, ma'am.
21	Q.	You worked with Michael Rice as
22	detectives in the New Orleans Police Department
23	for a number of years, correct?
24	A.	Upon advice of coun -- of my counsel,
25	I invoke my 5th Amendment Rights.

1    Q.   And -- and you and Michael Race became
2    good friends during your time together at the
3    New Orleans Police Department, correct?
4    A.   Upon advice of my counsel, I invoke my
5    5th Amendment Rights.
6    Q.   You worked closely together on a
7    number of homicide investigations, correct?
8    A.   Upon advice of my counsel, I invoke my
9    5th Amendment Rights, ma'am.
10   Q.   Including the investigations into the
11   murders of Bill Hines and Rodney Robinson,
12   correct?
13   A.   Upon advice of my counsel, ma'am, I
14   invoke my 5th Amendment Rights.
15   Q.   In fact, Michael Rice is the first
16   person you thank in the acknowledges in your
17   book, correct?
18   A.   Upon advice of my counsel, I invoke my
19   5th Amendment Rights.
20   Q.   And that's because you never could
21   have successfully solved these murders without
22   the hard work of your fellow detective, Michael
23   Rice, correct?
24   A.   Upon advice of my counsel, I invoke my
25   5th Amendment Rights.

1    in "Blood Warning" about conversations you had
2    with Steve London during the course of the
3    investigations into the Hines and Robinson
4    murders were accurate, correct?
5         A.   Upon advice of my counsel, I invoke my
6    5th Amendment Rights.
7         Q.   You may have changed words here and
8    there, but the substance of the communications
9    you reported in your book "Blood Warning" was
10   exactly what happened -- well, withdrawn.
11              You may have changed words here
12   and there, but, in substance, you recorded
13   accurately to the best of your ability your
14   communications with Steve London in your book,
15   "Blood Warning," correct?
16        A.   Upon advice of my counsel, I invoke my
17   5th Amendment Rights.
18        Q.   And your communications with Michael
19   Rice, correct?
20        A.   Again, upon advice of my counsel, I
21   invoke my 5th Amendment Rights.
22        Q.   And you also worked closely with a now
23   deceased New Orleans police officer named John
24   Reilly in the course of your investigation into
25   the murder of Bill Hines, correct?

1     Q.   You reviewed this book many, many
2  times before a manuscript was published, right?
3     A.   Upon advice of my counsel, I invoke my
4  5th Amendment Rights.
5     Q.   And you ensured that everything that
6  you wrote down in "Blood Warning" and held out
7  as the true story of a homicidal slasher told
8  by the detective who traced him down was as
9  accurate as you could possibly make it,
10 correct?
11    A.   Upon advice of my counsel, I invoke my
12 5th Amendment Rights.
13    Q.   Because the last thing you would ever
14 want to do is misrepresent in print something
15 that happened in the course of a criminal
16 investigation you conducted, correct?
17    A.   Upon advice of my counsel, I invoke my
18 5th Amendment Rights, ma'am.
19    Q.   And you -- the -- one of the last
20 things you would want to do is get your fellow
21 detective, Michael Rice, in trouble by writing
22 a false account of things Michael Rice did as a
23 homicide detective with the city of New
24 Orleans, correct?
25    A.   Upon advice of my counsel, I invoke my

Case 2:19-cv-08769-JTM-MBN Document 227-8 Filed 03/13/23 Page 10 of 19

53

1          Q.   You worked together to follow-up on
2     leads, correct?
3          A.   Upon advice of my counsel, I invoke my
4     5th Amendment Rights.
5          Q.   You interviewed a security guard named
6     Gladys McKinney together, correct?
7          A.   Upon advice of my counsel, I invoke my
8     5th Amendment Rights.
9          Q.   You interviewed a female detective who
10    had arrested a female prostitute you suspected
11    at one point together, right?
12         A.   Upon advice of my counsel, I invoke my
13    5th Amendment Rights.
14         Q.   You at one point chased a suspect
15    named OW Carter down the street together,
16    correct?
17         A.   Upon advice of my counsel, I invoke my
18    5th Amendment Rights.
19         Q.   Because of the obvious close
20    connection between the Hines and Robinson
21    murders, Mike Rice functioned, in effect, as
22    your partner on this investigation, correct?
23         A.   Upon advice of my counsel, I invoke my
24    5th Amendment Rights.
25         Q.   And Michael Rice, like you and

```
 1      going to be going past 5:00 potentially.
 2              BY MS. FREUDENBERGER:
 3                      You know, I just don't know.  You
 4      tell me how late -- how long we can take.
 5              BY MR. ROBERT:
 6                      I mean, is just 30 minutes enough
 7      time?
 8              BY MS. FREUDENBERGER:
 9                      Oh, that's fine for me.
10              BY MR. ROBERT:
11                      Does anybody have an objection to
12      that.
13              BY MS. FREUDENBERGER:
14                      Oh, let's go off the record.
15              BY THE VIDEOGRAPHER:
16                      We're now -- we're now off the
17      record.  The time is 12:37.
18                      (A lunch break was taken.)
19              BY THE VIDEOGRAPHER:
20                      We're now back on the record.
21      The time is 1:35.
22 EXAMINATION BY MS. FREUDENBERGER:
23          Q.  Detective Dillmann, by 1980, you were
24      familiar with the phenomenon of false
25      confessions, correct?
```

|   |   |
|---|---|
| 1 | A. Would you repeat. I'm sorry. |
| 2 | Q. Sure. By 1980, you were familiar with |
| 3 | the phenomenon of false confessions, correct? |
| 4 | A. Upon the advice of my counsel, I |
| 5 | invoke my 5th Amendment Rights. |
| 6 | Q. You understood by 1980, that sometimes |
| 7 | criminal suspects for a variety of reasons |
| 8 | would admit to crimes they had not committed, |
| 9 | correct? |
| 10 | A. Upon the advice of my counsel, I |
| 11 | invoke my 5th Amendment Rights. |
| 12 | Q. Especially individuals with low IQ, |
| 13 | correct? |
| 14 | A. Upon advice of my counsel, I invoke my |
| 15 | 5th Amendment Rights. |
| 16 | Q. You understood that certain categories |
| 17 | of individuals who more likely than others to |
| 18 | be susceptible to making a false confession, |
| 19 | correct? |
| 20 | A. Upon advice of my counsel, I invoke my |
| 21 | 5th Amendment Rights. |
| 22 | Q. And that included juveniles, correct? |
| 23 | A. Upon advice of my counsel, I invoke my |
| 24 | 5th Amendment Rights. |
| 25 | Q. And individuals under the influence of |

```
 1    line, correct?
 2         A.   Upon advice of my counsel, I invoke my
 3    5th Amendment Rights.
 4         Q.   And that's a practice you understood
 5    by 1980, correct?
 6         A.   Upon the advice of my counsel, I
 7    invoke my 5th Amendment Rights.
 8         Q.   And the practice that you followed in
 9    this case and in others, correct?
10         A.   Upon advice of my counsel, I invoke my
11    5th Amendment Rights.
12         Q.   In the Bill Hines' murder, you
13    intentionally withheld details about the crime
14    from the press and the public so that they
15    would be available to you to use in an
16    interrogation down the line in order to see
17    whether a suspect's admission was, in fact,
18    true, correct?
19         A.   Upon advice of my counsel, I invoke my
20    5th Amendment Rights.
21         Q.   And you understood that the details we
22    went through earlier that you had gleaned from
23    the crime scene were details only the police
24    and the true perpetrator of the -- well,
25    withdrawn.
```

1   that John Floyd volunteered to you that he had
2   killed Rodney Robinson while you were
3   interrogating him of the murder of Bill Hines,
4   correct?
5        A.   Upon advice of my counsel, I invoke my
6   5th Amendment Rights.
7        Q.   And then you -- you participated with
8   Detective Rice in obtaining a confession from
9   Mr. Floyd to the Robinson murder, correct?
10       A.   Upon advice of my counsel, I invoke my
11  5th Amendment Rights.
12       Q.   And that confession, the confession to
13  the Robinson murder, is almost identical to the
14  confession that Mr. -- you documented from
15  Mr. Floyd purportedly admitting to the Hines'
16  murder, correct?
17       A.   Upon advice of my counsel, I invoke my
18  5th Amendment Rights.
19       Q.   And the confession to the Robinson
20  murder also contains a number of details that
21  had been intentionally withheld from the press
22  and the public in this case, correct?
23       A.   Upon advice of my counsel, I invoke my
24  5th Amendment Rights.
25       Q.   And that's because, like the Bill

1     5th Amendment Rights.
2          Q.   That all it took was telling him that
3     he had been bragging about committing two
4     murders and he volunteered to you that he had,
5     in fact, done them, correct?
6          A.   Upon advice of my counsel, I invoke my
7     5th Amendment Rights.
8          Q.   But what you reported to -- you also
9     reported to the prosecutors that the -- the
10    entire process of taking the confession only
11    lasted approximately three hours between when
12    you left the bar and when you started taking
13    the -- documenting the typed confession,
14    correct?
15         A.   Upon advice of my counsel, I invoke my
16    5th Amendment Rights.
17         Q.   But, in fact, you lied to the
18    prosecutor about the timing, correct?
19         A.   Upon advice of my counsel, I invoke my
20    5th Amendment Rights.
21         Q.   You -- as you admitted subsequently in
22    an interview with a television station, you
23    spent hours with John Floyd prior to getting
24    his -- him to admit to these crimes, correct?
25         A.   Upon advice of my counsel, I invoke my

```
1        5th Amendment Rights.
2             Q.   Hours drinking in the bar, right?
3             A.   Upon advice of my counsel, I invoke my
4        5th Amendment Rights.
5             Q.   And then hours with him once you got
6        to the police headquarters, correct?
7             A.   Upon advice of my counsel, I invoke my
8        5th Amendment Rights.
9             Q.   You threatened to throw him out the
10       window, correct?
11            A.   Upon advice of my counsel, I invoke my
12       5th Amendment Rights.
13            Q.   You threatened that you would come
14       after him in the streets, correct?
15            A.   Upon advice of my counsel, I invoke my
16       5th Amendment Rights.
17            Q.   You physically hit him, correct?
18            A.   Upon advice of my counsel, I invoke my
19       5th Amendment Rights.
20            Q.   You slapped him multiple times with an
21       open hand with the hopes that it wouldn't leave
22       a mark, right?
23            A.   Upon advice of my counsel, I invoke my
24       5th Amendment Rights.
25            Q.   And ultimately, you got John Floyd to
```

```
 1      unlike the serology evidence, for example,
 2      correct?
 3             A.   Upon advice of my counsel, I invoke my
 4      5th Amendment Rights.
 5             Q.   Or the hair comparison evidence,
 6      correct?
 7             A.   On advice of my counsel, I invoke my
 8      5th Amendment Rights.
 9             Q.   The difference between the hair
10      comparisons and the serology evidence is that
11      those tests were done by a unit that drafted
12      their own reports, correct?
13             A.   Upon advice of my counsel, I invoke my
14      -- invoke my 5th Amendment Rights.
15             Q.   But because of the New Orleans Police
16      Department policy that only matches and not
17      exclusions were documented, you were able to
18      get away with not documenting the exclusion of
19      John Floyd as the source of the prints on the
20      whiskey battle, correct?
21             A.   Upon advice of my counsel, I invoke my
22      5th Amendment Rights.
23             Q.   And by the way, sir, you've never seen
24      in your career as a homicide detective a
25      written report of documenting a fingerprint
```

```
1     Orleans Police Department policy requiring you
2     to report a exclusion of a known suspect's
3     prints in this case or others, correct?
4          A.   Would you repeat the question, please.
5          Q.   Sure.  You knew that there was no New
6     Orleans Police Department policy requiring you
7     to report a fingerprint exclusion of a named
8     suspect to the district attorney's office,
9     corrects?
10         A.   Upon advice of my counsel, I invoke my
11    5th Amendment Rights.
12         Q.   And you also knew that the only report
13    the latent print analyst would make was a
14    verbal report directly to you, correct?
15         A.   Upon advice of my counsel, I inv --
16    invoke my 5th Amendment Rights.
17         Q.   And to the extent that secretaries
18    were preparing case packages for the DA's
19    office, they would only include written
20    reports, correct?
21         A.   Upon advice of my counsel, I invoke my
22    5th Amendment Rights.
23         Q.   Not your own personal handwritten
24    notes, right?
25         A.   Upon advice of my counsel, I invoke my
```

```
 1      5th Amendment Rights.
 2           Q.   And certainly not any information that
 3      was only in your head, correct?
 4           A.   Upon advice of my counsel, I invoke my
 5      5th Amendment Rights.
 6           Q.   Have you ever heard the term "tunnel
 7      vision," before, sir?
 8           A.   I'm sorry?
 9           Q.   Have you ever heard the term "tunnel
10      vision" before?
11           A.   Upon the advice of my counsel, I
12      invoke my 5th Amendment Rights.
13           Q.   Did you have training in avoiding
14      tunnel vision prior to 1980?
15           A.   Upon advice of my counsel, I invoke my
16      5th Amendment Rights.
17           Q.   Would you describe your training in
18      the field of interrogations for me.
19           A.   Upon advice of my counsel, I invoke my
20      5th Amendment Rights.
21           Q.   You certainly understood prior to
22      1980, that was -- it was grossly improper to
23      misrepresent to the prosecutors the
24      circumstances surrounding admissions you
25      obtained from a suspect, correct?
```