UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**JD FLOYD**                                              **CIVIL ACTION**

**VERSUS**                                                **NO: 19-8769**

**JOHN DILLMAN ET AL.**                                   **SECTION: "H"**

### ORDER AND REASONS

Before the Court is Defendant Michael Rice's Motion to Dismiss and/or Summary Judgment (Doc. 215). For the following reasons, the Motion is **DENIED**.

### BACKGROUND

This case arises from Plaintiff JD Floyd's wrongful conviction and imprisonment for the murder of William Hines, Jr.

In November 1980, William Hines, Jr. and Rodney Robinson were murdered in the New Orleans French Quarter, one mile apart and close in time to one another. Hines, a gay white male, was found nude and stabbed to death in his bedroom. There were no signs of forced entry, and one glass of alcohol was found in Hines's bedroom, another in his kitchen. Friends of Hines told Detective John Dillman, the lead detective on the murder investigation, that Hines would often attempt to pick up sexual partners while intoxicated. The New Orleans Police Department (NOPD) Crime Laboratory analyzed evidence recovered from the scene and found hairs belonging to an African American person on Hines's bed sheets. Because Hines's body was not discovered until

1

at least 24 hours after his death, any evidence of seminal fluid or spermatozoa was undetectable. The blood at the scene, however, was from a person with Type A blood. Fingerprints lifted from a bottle of whiskey on Hines's kitchen table did not match the victim's or Plaintiff's prints, though this evidence was never disclosed to the defense.

About three days after Hines's murder, Robinson was stabbed to death at a nearby hotel. Detective Michael Rice allegedly acted as lead detective on the Robinson investigation. Robinson, a gay Black male, was found with a blue knit cap stained with Type O blood, which was Robinson's blood type. The knit cap also contained hair belonging to an African American—but not, according to the NOPD lab, Robinson's. Inside Robinson's hotel room, police found drinking glasses on each end table next to the bed and a white tissue paper with seminal fluid on it. An analysis of the semen revealed that it was produced by someone with Type A blood. Fingerprints taken from the drinking glasses and the passenger side of Robinson's car did not match Plaintiff's, though again this was not revealed to Plaintiff until years after trial. Additionally, a hotel security guard reported that she saw an African American man running from the back door of the hotel shortly before the police arrived.

Initially, Detectives Dillman and Rice investigated Black men as the lead suspects in the Hines and Robinson cases. Later, after a tip from someone that Plaintiff had made incriminating statements to him, the detectives shifted their focus to Plaintiff—a white male with Type B blood. At the time, Plaintiff was living in the French Quarter as a "drifter" with a drug and alcohol problem. Plaintiff has an intellectual disability and an IQ of 59. On January 19, 1981, Detective Dillman and NOPD Officer John Reilly found Plaintiff drinking at the Louisiana Purchase Bar in the French Quarter. They bought him at least one drink before taking him outside to arrest him. At NOPD's Homicide Office,

Detective Dillman and Officer Reilly, joined by Detective Rice, interrogated Plaintiff, who initially denied involvement in the murders but later broke down and confessed. The officers obtained signed confessions to both murders from Plaintiff. Plaintiff alleges these officers fabricated the confessions and included details in them known only to the perpetrator of the murders. Plaintiff further alleges that the officers physically assaulted, threatened, and coerced him into signing the confessions.

Plaintiff was indicted on two counts of second-degree murder. He waived his right to a jury trial and proceeded to a joint bench trial in Orleans Parish Criminal District Court. After Plaintiff was found guilty of Hines's murder but was acquitted of Robinson's, he was sentenced to life imprisonment without parole. The Louisiana Supreme Court affirmed his conviction and sentence.[1]

In 2008, the Innocence Project New Orleans (IPNO) discovered copies of the NOPD Latent Print Unit's logbook that revealed that Plaintiff was not the source of fingerprints left at both murder scenes. This evidence was generated pre-trial yet never disclosed to Plaintiff or his counsel. That same year, IPNO also discovered that John Clegg, a close friend of Hines, had told Detective Dillman during the investigation that Hines had a distinct sexual preference for Black males. Dillman had testified at trial that he was told that Hines had sexual relations with both Black and white males.

In light of this new evidence, and on a motion for federal habeas relief under 28 U.S.C. § 2254, another section of this Court found that Plaintiff had satisfied the *Carrier* standard of "a constitutional violation [that] has probably resulted in the conviction of one who is actually innocent" and that therefore his habeas petition was not untimely.[2] The Court then granted habeas relief

---

[1] State v. Floyd, 435 So. 2d 992 (La. 1983).
[2] Murray v. Carrier, 477 U.S. 478, 496 (1986); *see also* Floyd v. Cain, No. 11-2819, 2016 WL 4799093 (E.D. La. Sept. 14, 2016) (Vance, J.).

3

based on the State's *Brady* violations of withholding the exculpatory fingerprint results and the statement from Clegg.[3] The State was ordered to retry or release Plaintiff within 120 days of the decision. This order was stayed when the State appealed to the Fifth Circuit. The Fifth Circuit affirmed this Court's rulings on both grounds: evidence of Plaintiff's actual innocence meant his petition was not untimely and he was entitled to relief on the merits based on his *Brady* claims.[4] After the United States Supreme Court denied certiorari on the State's appeal, all charges against Plaintiff were dismissed.

Based on his wrongful imprisonment, Plaintiff brings claims under 42 U.S.C. § 1983 and state law against the City of New Orleans, District Attorney Jason Williams, and New Orleans Police Department Detective John Dillman, Detective Michael Rice, and Lieutenant Stephen London.[5] In the instant Motion, Defendant Rice moves for dismissal or alternatively for summary judgment regarding Plaintiff's § 1983 claims against him, arguing that he is entitled to qualified immunity. Plaintiff opposes.

Although Defendant Rice's Motion was styled as a Motion to Dismiss or Alternatively for Summary Judgment, the Motion is converted to a motion for summary judgment because Defendant has attached matters outside the pleadings, which the Court chooses not to exclude.[6] The Court further finds that both parties have received adequate notice that this Motion might be converted because both parties have attached matters outside the pleadings.

## **LEGAL STANDARD**

---

[3] *See* Floyd v. Vannoy, No. 11-2819, 2017 WL 1837676 (E.D. La. May 8, 2017) (Vance, J.).
[4] *See* Floyd v. Vannoy, 894 F.3d 143 (5th Cir. 2018).
[5] Defendant Stephen London was dismissed from this case on August 12, 2022. Doc. 159.
[6] FED. R. CIV. P. 12(d).

4

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[7] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[9] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[10] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[11] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[12] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the

---

[7] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[8] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[9] Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).
[10] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[11] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[12] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

necessary facts."[13]  Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[14]

## LAW AND ANALYSIS

Defendant Rice argues that he is entitled to qualified immunity from Plaintiff's § 1983 claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[15] Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."[16]

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. . . . The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation.[17]

A qualified immunity defense also alters the usual burden of proof on summary judgment.[18] Once a government official asserts qualified immunity, the plaintiff has the burden of rebutting "the officers' qualified-immunity defense by establishing a genuine fact issue as to whether the officers' allegedly wrongful conduct violated clearly established law."[19] Thus, to defeat qualified

---

[13] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[14] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).
[15] Griggs v. Brewer, 841 F.3d 308, 312 (5th Cir. 2016) (internal quotation omitted).
[16] Estate of Davis *ex rel.* McCully v. City of N. Richland Hills, 406 F.3d 375, 380 (5th Cir. 2005).
[17] Tolan v. Cotton, 572 U.S. 650 (2014).
[18] Eng. v. Philips, No. CV 21-400, 2022 WL 17045369, at *4 (E.D. La. Nov. 17, 2022) (quoting Bourne v. Gunnels, 921 F.3d 484, 490 (5th Cir. 2019)).
[19] Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir. 2011).

immunity, Plaintiff must establish a genuine fact issue as to whether (1) Defendant Rice violated his statutory or constitutional rights, and (2) whether the right was clearly established at the time of the challenged conduct.[20] At this stage, all factual inferences must be drawn in Plaintiff's favor.[21]

I. *Whether Defendant Rice's Conduct Violated a Federal Right*

The first inquiry is whether Plaintiff has established a material fact issue as to whether Defendant Rice's allegedly wrongful conduct violated a federal right. On this point, Defendant Rice's Motion essentially argues that he was not sufficiently involved in the investigation and subsequent wrongful conviction of Plaintiff to be held liable. Defendant Rice specifically argues that (1) Plaintiff was wrongfully convicted and incarcerated for the murder of William Hines, Jr. ("the Hines murder"), not the murder of Rodney Robinson ("the Robinson murder"); (2) Defendant Rice was not the lead investigator on Robinson's case; and (3) Defendants Dillman and Reilly were solely responsible for fabricating and coercing Plaintiff's confession. Plaintiff responds that he provided sufficient evidence to create several issues of material fact to rebut Defendant Rice's qualified immunity defense and defeat summary judgment. This Court finds that, taking all evidence in the light most favorable to Plaintiff, there are several fact issues regarding whether Defendant Rice actively participated in the violations of Plaintiff's constitutional rights.

i. *Whether the Hines and Robinson Murders, Investigations, and Trials were Interconnected*

At the outset, this Court rejects Defendant Rice's first argument that he is not implicated simply because Plaintiff was convicted of the Hines murder and not the Robinson murder. Defendant Rice argues that he "would not have

---

[20] Craig v. Martin, 49 F.4th 404, 409 (5th Cir. 2022) (citing Gibson v. Kilpatrick, 773 F.3d 661, 666 (5th Cir. 2014)).
[21] Brown v. Callahan, 623 F.3d 249 (5th Cir. 2010).

7

been named a defendant in this proceeding if the Robinson case had been tried separately in court instead of part of one proceeding" and that he "is not accused of doing anything illegal or committing any constitutional violation with respect to the Hines case where Floyd was convicted."[22] This argument is foreclosed by reality, as the murders were not tried separately. This Court finds, as has another section of this Court and the Fifth Circuit, that the two murders, investigations, and trials are inextricably linked and cannot be separated. In granting Plaintiff's habeas petition, the court stated that as both confessions were intertwined, "evidence tending to discredit Floyd's confession to the Robinson murder also undermines Floyd's account of killing Hines."[23] Defendant Rice is clearly involved because the confessions were taken simultaneously by the same police officers, and Defendant Rice was present for both.[24] Defendant Rice's contention, therefore, that his conduct in investigating the Robinson murder is somehow completely unrelated to Plaintiff's wrongful conviction in the Hines murder is not supported by the record.

> ii. *In What Capacity Did Defendant Rice Participate in the Robinson Investigation*

The crux of Defendant Rice's argument is that he was only tangentially involved with the investigation that led to Plaintiff's wrongful conviction. Defendant Rice contends that within hours of the body being discovered at the crime scene, Platoon Commander Martin Venezia (who is now deceased) directed him to turn over the Robinson investigation to Patrol Officer Reilly

---

[22] Doc. 2 at 2.
[23] Floyd v. Vannoy, No. 11-cv-2819, 2017 WL 1837676 (E.D. La. May 8, 2017).
[24] Defendant Rice witnessed the Hines confession and took the confession for the Robinson murder. Doc. 215-1 at 7; The Fifth Circuit affirmed Judge Vance's opinion granting Plaintiff's habeas petition. Floyd v. Vannoy, 894 F.3d 143, 155 (5th Cir. 2018) (stating that because "Floyd's confessions are intertwined, evidence demonstrating Floyd falsely confessed to murdering Robinson supports his assertions he likewise did so for Hines").

(also deceased).[25] The record, however, is littered with evidence to the contrary. First, Officer Reilly testified at the suppression hearing in Plaintiff's case that he was not involved with the original investigation into either the Hines or Robinson murders.[26] Next, Stephen London, the Lieutenant in charge of the homicide division at the time, recalled Officer Reilly and testified that Reilly did not direct the Robinson investigation.[27] London further stated that to his knowledge, during his tenure, there had never been an instance where a patrol officer had been directed to take the lead on a murder investigation.[28] Furthermore, Defendant Dillman has repeatedly described Defendant Rice as the lead investigator on the Robinson murder.[29] Defendant Rice has even described himself at the lead investigator in the Robinson murder in proceedings conducted in the original trial for the murders of Hines and Robinson and also in this matter.[30] As the investigations of both murders are connected, the extent of Defendant Rice's involvement in the Robinson investigation is imperative to determining whether he participated in the violation of Plaintiff's constitutional rights. On this record, the Court finds that Plaintiff has presented substantial evidence to contradict Defendant Rice's

---

[25] Defendant Rice claims he was instructed to turn over the investigation because Officer Reilly was familiar with gay bars in the French Quarter. Doc. 215-2 at 97–98.
[26] Doc. 227-12 at 3.
[27] Doc. 227-11 at 7–9.
[28] Doc. 227-11 at 7–9.
[29] At the Suppression Hearing in 1981, Defendant Dillmann stated that he "called Detective Rice who was the Officer or the Detective in charge of the second homicide." Doc. 227-10 at 3. In Defendant Dillmann's deposition taken in 2017 for another matter, *Adams v. City of New Orleans et al.,* he stated that "Michael Rice was the lead detective on [the Robinson] case." Doc. 227-13 at 5.
[30] In Defendant Rice's deposition, taken in March of 2022, when asked if he was the lead detective on the case he responded, "[t]hat's right." Doc. 227-1 at 24. When testifying at Plaintiff's criminal trial in 1982 he stated that "Dillmann wasn't clear as to the facts and details of the [Robinson] case and that he was supervising the Robinson investigation. Doc. 227-2 at 11. Defendant Rice's report also contains no mention of Officer Reilly. During Defendant Rice's deposition he was questioned about Officer Reilly's absence from the report, and he had no explanation. Doc. 227-1 at 44–45.

contention that he was "marginalized" from the Robinson murder investigation.[31]

### iii. To What Extent Did Defendant Rice Participate in Plaintiff's Coerced Confessions to the Robinson and Hines Murders

Defendant Rice also argues that he was not involved in the coerced and fabricated confessions and that Defendant Dillman and Officer Reilly were solely responsible. Evidence on this point is also muddled. In Defendant Rice's deposition, he asserts that he witnessed Plaintiff's confession to the Hines murder and took Plaintiff's confession to the Robinson murder in succession, and that during this time no facts about either crime scene were provided to Plaintiff.[32] Contrastingly, Plaintiff testified at his own trial in 1982 that the confessions given to the Hines and Robinson murders were coerced.[33] Regarding the Robinson confession, specifically, Plaintiff testified that an officer fed him information regarding the murders and that he repeated after the officer, affirmatively stating "[t]that's the way it happened."[34] While Plaintiff was not specific about who was feeding him information, Defendant Rice testified that he was there the whole time for both confessions, and that the confessions were free and voluntary.[35] During his deposition, Plaintiff also testified that the confessions were already typed up whenever he was placed in the holding cell, and that the details about the crime scene were already in the confessions.[36] Plaintiff's recollection of the confessions differs markedly from what Defendant Rice has presented to the Court. Thus, whether

---

[31] Doc. 215-2 at 20 (Defendant Rice stated he was "marginalized" from the Robinson murder investigation).
[32] Doc. 227-1 at 37.
[33] Doc. 227-2 at 14–16.
[34] *Id.* at 14–16. While the "he" is unidentified, Defendant Rice has stated elsewhere in the record that he witnessed the Hines confession and took the Robinson confession.
[35] Doc. 227-3 at 5–6.
[36] Doc. 227-4 at 6.

Defendant Rice actively participated in the fabrication of Plaintiff's coerced confessions is another disputed issue of material fact.

       *iv.*    *Did Defendant Rice Suppress Fingerprint Evidence*

Defendant Rice argues that he is unaware of who directed the fingerprint unit to run Plaintiff's fingerprints against those from the crime scene, that he never saw the envelope with the notation "Not John Floyd," and that he does not know what the analyst's note "Not John Floyd" means.[37] Plaintiff argues that there is sufficient evidence to discredit Rice's contentions and to find that Rice suppressed the fingerprint evidence.

During the investigation into the Robinson murder, Defendant Rice documented in his police report that it was his intent to have all suspects' fingerprints compared to the fingerprints lifted from the Robinson crime scene, despite the fact that it was New Orleans Police Department's policy to not note fingerprint exclusions in writing.[38] Despite the fact that he was not required to, Defendant Rice had prints from another suspect, David Hennessey, run against the prints lifted from the Robinson crime scene.[39] When the prints were excluded as being the source of those from the crime scene, Defendant Rice noted the exclusion in his police report.[40]

At some point during the investigation, an unidentified person directed the Latent Print Unit to compare Plaintiff's fingerprints to those found at the Robinson crime scene, and an envelope was generated with a notation, "Not John Floyd." These results were never disclosed to the District Attorney's office.[41] The trial prosecutor in the case, David Plavnicky, testified that he

---

[37] Doc. 227-1 at 23–24. Defendant Rice was asked what "Not John Floyd" meant during his deposition and he answered that "[he does] not know what it means." *Id.*
[38] Doc. 227-1 at 20.
[39] Doc 227-6 at 22.
[40] *Id.* at 22.
[41] Doc. 227-14 at 15.

would have assumed Defendant Rice to be the one who directed the fingerprint unit to run Plaintiff's prints.[42]

Given Defendant Rice's assertion of his intent to document fingerprint exclusions, the fact that he did document that David Hennessey's fingerprints were excluded as being the source of those at the crime scene, and Plavnicky's testimony that he would expect the lead detective to be the one to generate and relay the fingerprint exclusions, there is an issue of material fact as to whether Defendant Rice suppressed exculpatory fingerprint evidence. Additionally, as the David Hennessey results were relayed in the same manner—a notation which read "Not David Hennessey"—there is considerable dispute about whether Defendant Rice knew what "Not John Floyd" meant.[43] Based on Defendant Rice's deposition testimony, and taking all factual inferences in Plaintiff's favor, it is disputed whether Defendant Rice ran Plaintiff's fingerprints, saw the envelope, knew what "Not John Floyd" meant, and failed to disclose that information to the District Attorney's office.

Taking all evidence in the light most favorable to Plaintiff, Plaintiff has created several genuine issues of material fact as to whether Defendant Rice participated in the violation of his constitutional rights. Namely, Plaintiff's Complaint alleged that Rice failed to turnover *Brady* evidence,[44] fabricated evidence to obtain a criminal conviction,[45] and used a coerced confession to obtain a conviction in violation of § 1983 and state law.[46] Based on the evidence presented, the Court finds that Plaintiff has presented sufficient evidence to

---

[42] Doc. 227-14.
[43] Doc. 227-19 at 11.
[44] Brady v. Maryland, 373 U.S. 83, 86 (1963); Brown v. Miller, 519 F.3d 231, 238 (5th Cir. 2008).
[45] Brown v. Miller, 519 F.3d 231 (5th Cir. 2008).
[46] Brown v. Mississippi, 297 U.S. 278 (1936); Chambers v. Florida, 309 U.S. 227 (1940).

12

create various issues of material fact regarding Defendant Rice's qualified immunity defense.

## II. *Whether the Rights in Question Were Clearly Established*

The second prong of the qualified immunity analysis is whether the rights in question were clearly established at the time of the violation.[47] It is undisputed—and Defendant does not oppose—that it is clearly established that officers may not coerce or fabricate a confession, use a coerced or fabricated confession to obtain a conviction, or withhold exculpatory evidence from a prosecutor.[48] If Defendant Rice participated in coercing or fabricating Plaintiff's confession or withheld exculpatory evidence—issues which are in dispute here—clearly established law prevents him from receiving qualified immunity.

## III. *Whether Punitive Damages Are Available Under § 1983*

Defendant Rice also moves for dismissal of Plaintiff's claim for punitive damages. Punitive damages may be awarded in an action under § 1983 when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[49] Defendant Rice argues that Plaintiff cannot present evidence that his conduct rises to this level. Plaintiff argues that Defendant Rice showed reckless or callous indifference when he participated in the fabrication and coercion of a confession and withheld fingerprint evidence. This Court finds that Plaintiff has presented sufficient evidence as discussed above to create various issues of material fact on this claim. Accordingly, Defendant Rice's request for summary judgment is denied.

---

[47] Tolan v. Cotton, 572 U.S. 650 (2014).
[48] *Brady*, 373 U.S. at 83; Brown v. Miller, 519 F.3d 231, 238 (5th Cir. 2008); Brown v. Mississippi, 297 U.S. 278 (1936); *Chambers*, 309 U.S. 227.
[49] Smith v. Wade, 461 U.S. 30, 56 (1983).

## CONCLUSION

For the foregoing reasons, Defendant Rice's Motion for Summary Judgment is **DENIED.**


New Orleans, Louisiana this 10th day of April, 2023.

_____
**JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE**